[No. 29281. Department One. September 7, 1944.]

THE GEORGIAN HOUSE OF INTERIORS, INC., *Appellant*, v. GLENS FALLS INSURANCE COMPANY *et al., Respondents.*[1]

[1]Reported in 151 P. (2d) 598.

*Reuben Lee Crandell,* for appellant.

*Patterson & Patterson,* for respondents.

JEFFERS, J.—The Georgian House of Interiors, Inc., instituted five separate actions on five different policies of fire insurance against the following named insurance companies, to wit, Glens Falls Insurance Company, The Allemannia Fire Insurance Company, The Home Insurance Company, Seaboard Fire & Marine Insurance Company of New York, and The Yorkshire Insurance Company, to recover from those companies on their respective policies for loss and damage claimed to have been sustained by plaintiff as the result of two fires. The above companies will hereinafter be referred to as Glens Falls, Allemannia, Home, Seaboard, and Yorkshire, respectively.

Each complaint, with the exception of that against Home, contained two causes of action. The first cause of action in each complaint was based on the damage and loss claimed to have been sustained in the first fire, which occurred May 22, 1942, and the second cause of action in each complaint, except the one against Home, was based on the loss and damage claimed to have been sustained in the second fire, which occurred July 23, 1942.

By stipulation and order of court, the five actions were consolidated for all purposes into one action, under the title

of the above-named plaintiff as plaintiff and the several defendants as defendants.

The allegations in the several complaints were practically the same, except as to the amounts claimed against the different companies. It is alleged and admitted that, at the time of the first fire, May 22, 1942, plaintiff held policies of fire insurance written by the various companies in the following amounts: Yorkshire, $2,000; Home, $6,000; Seaboard, $5,000; Allemannia, $5,000; Glens Falls, $3,000; or a total of $21,000.

It is alleged that plaintiff, within the time provided for in the policies, after the first fire prepared and sent to each of the above-named companies a sworn statement of proof of loss, showing that the defendants, respectively, were liable to it for loss resulting from the first fire as follows: Yorkshire, $1,439.10; Glens Falls, $2,158.71; Seaboard, $3,597.34; Home, $4,317.65; and Allemannia, $3,597.84; making a total claim for loss sustained by the first fire in the amount of $15,110.64.

Defendants admit that what purported to be a sworn proof of loss was served upon each of them, but deny that it was in accordance with the terms of the policies, and deny any and all liability by reason thereof.

It is further alleged that plaintiff has performed all the conditions of the policies on its part to be performed; defendants deny this, and allege that plaintiff has failed to comply with the following provisions of the policies, to wit: (a) It failed, as required, to make a complete inventory of the damaged merchandise, *stating the quantity and cost of each article;* (b) it failed to submit to examination under oath, as required by the policies; (c) it failed to produce for examination all of its books of account, bills, invoices, or other vouchers, or certified copies thereof if the originals be lost; (d) it failed to comply with the provisions of the rider attached to each of the policies, which rider is captioned "Inventory and Iron-safe Clause," and each and every part thereof; (e) it failed to submit proof of loss as required by the policies.

It is alleged in the second cause of action that plaintiff's property covered by the policies was further damaged by the second fire in the sum of $9,455.81. It is further alleged and admitted that at the time of the second fire plaintiff held fire insurance policies which were in full force and effect, written by the companies hereinbefore named, except Home, for the amounts hereinbefore set out.

It is alleged that a second statement of proof of loss was prepared and served upon each of the companies within the time provided for in the policies. Defendants admit that what purported to be a second proof of loss was served upon each of them within the time provided by the policies, but deny that such proofs of loss were in accordance with the terms of the policies, and deny any liability by reason thereof.

Plaintiff further alleges that, as a result of the second fire, each of the companies, with the exception of Home, is liable to it in the following named amounts, or so much thereof as shall remain after deducting from the principal amount of the respective policies such amount as shall be determined to be due plaintiff on its first cause of action: Yorkshire, $1,258.84; Glens Falls, $1,888.26; Seaboard, $3,153.91; and Allemannia, $3,153.91.

Plaintiff also alleges that it has complied with all the terms of the policies on its part to be performed. This, defendants deny, and allege that plaintiff has failed to comply with the same provisions of the policies as were set out in answer to the first cause of action.

Defendants, by their answers, admit that fires occurred on May 22 and July 23, 1942, and admit that certain property located in the building where the respective fires occurred was damaged, but allege that they have not sufficient information to enable them to form a belief as to the nature or amount of such damage, and therefore deny that the property was damaged in the respective sums claimed by plaintiff, or at all.

Defendants pleaded affirmatively the failure on the part of plaintiff, after demand made upon it so to do, to comply with the provisions of the policies hereinafter set out.

Plaintiff by its reply denies the affirmative matter set up in defendants' answers.

These policies all covered

" . . . merchandise of every description, including property of others, consisting principally of furniture and antiques manufactured or in process of manufacture, and on materials for manufacturing same, including packages, labels, cases, boxes and all wrapping and packing materials, all being the property of insured or sold but not removed. . . . "

The policies also contained the following provisions:

"This company shall not be liable beyond the actual cash value of the property at the time any loss or damage occurs, and the loss or damage shall be ascertained or estimated according to such actual cash value, with proper deduction for depreciation however caused, and shall in no event exceed what it would then cost the insured to repair or replace the same with material of like kind and quality; said ascertainment or estimate shall be made by the insured and this company, or, if they differ, then by appraisers, as hereinafter provided; and, the amount of loss or damage having been thus determined, the sum for which this company is liable pursuant to this policy shall be payable sixty days after due notice, ascertainment, estimate, and satisfactory proof of the loss have been received by this company in accordance with the terms of this policy."

The policies also provide:

"If fire occur the insured shall give immediate notice of any loss thereby in writing to this company, protect the property from further damage, forthwith separate the damaged and undamaged personal property, put it in the best possible order, *make a complete inventory of the same, stating the quantity and cost of each article and the amount claimed thereon;* and, within sixty days after the fire, unless such time is extended in writing by this company, shall render a statement to this company, signed and sworn to by said insured, stating the knowledge and belief of the insured as to the time and origin of the fire; the interest of the insured and of all others in the property; *the cash value of each item thereof and the amount of loss thereon.* . . . " (Italics ours.)

Beginning on line 81 of the policies, we find this provision:

"The insured, as often as required, shall exhibit to any person designated by this company all that remains of any property herein described, and submit to examinations under oath by any person named by this company, and subscribe the same; and, as often as required, shall produce for examination *all books of account, bills, invoices and other vouchers, or certified copies thereof if originals be lost,* at such reasonable place as may be designated by this company or its representative, and shall permit extracts and copies thereof to be made." (Italics ours.)

Attached to and made a part of each policy is a rider captioned "Inventory and Iron-safe Clause," which provides:

"It is made a condition of this insurance:

" (1) That the insured under this policy shall take an inventory of the stock of merchandise hereby insured at least once every twelve months during the term of this policy, and unless such inventory has been taken within one year prior to the date of this policy, one shall be taken in detail within thirty (30) days thereafter.

" (2) That the insured shall keep a set of books showing *a complete record of business transacted, including all purchases and sales both for cash and for credit.*

" (3) That the insured shall keep such books and inventory securely locked in a fireproof safe at night, and at all times when the store mentioned in the within policy is not actually open for business, or in some secure place not exposed to a fire which would destroy the building where such business is carried on.

" (4) That in case of loss the insured shall produce such books and last inventory, and failing so to do, the insurance under this policy on stock of merchandise shall be rendered null and void." (Italics ours.)

The above provisions of the policies and the rider are all standard provisions.

The cause came on for hearing on September 15, 1943, before the court and a jury. At the close of plaintiff's case, after witnesses had been sworn and testified and many exhibits introduced, defendants interposed a challenge to the legal sufficiency of the evidence to warrant a verdict in favor of plaintiff. The challenge was sustained after extended argument and after the court had prepared and filed

an extensive written decision, wherein much of the testimony was referred to. The decision was based upon two grounds: (1) That on behalf of the insured there had been no substantial, or in fact any, compliance with the provisions of the iron-safe clause; and (2) that there had been a failure on the part of plaintiff to comply with the provisions of the policies (lines 81 to 85) relative to its submission to examination under oath and to produce for examination all books of account, bills, invoices, and other vouchers, or certified copies thereof if the originals be lost. The court seems to have based its decision in so far as the second ground is concerned, upon the case of *Ward v. Nat. Fire Ins. Co.*, 10 Wash. 361, 38 Pac. 1127.

Motion for new trial was made and denied, and on October 13, 1943, the court entered judgment dismissing the several complaints with prejudice. Plaintiff gave timely notice of appeal.

Error is assigned in sustaining respondents' challenge to the legal sufficiency of the evidence; in discharging the jury from consideration of the case; in dismissing appellant's action; in denying appellant's motion for new trial; and in entering judgment in favor of respondents.

The statement of facts in this case consists of over six hundred pages. There are several boxes of exhibits.

The two principal witnesses were Clark Benton, vice-president of appellant, and Beverly Cronin, secretary and treasurer of appellant.

Appellant was incorporated about 1936, since which time a Mr. Marshall has been president, Mr. Benton, vice-president, and Beverly Cronin, secretary and treasurer. In the spring of 1937, appellant moved to the location where the first fire occurred, which is on the Pacific highway about half way between Tacoma and Seattle. The building occupied by appellant was a story and a half frame building. On the first floor there was a large show room and adjoining that another show room. There was also a drapery room where draperies, drapery stock, and samples were kept. There were also three work rooms. The upstairs consisted of two rooms, one of which was finished and in which uphol-

stering stock was kept. In the unfinished room appellant kept the overflow stock of furniture, that is, furniture not in the display rooms below.

The fire of May 22nd was principally in the north end of the upstairs, where the upholstery was kept. The fire apparently spread from this room to the large unfinished room upstairs and burned through the floor, so that some things fell into the show rooms below.

The first fire occurred about eight-thirty on the evening of May 22, 1942. Mr. Benton and Miss Cronin locked up the building about five o'clock that evening and went home. They lived some distance from the building. They were notified of the fire, and immediately returned to the building. After the fire was put out, and on the same night, all of the merchandise was removed to a building known as the Grove, which was a short distance up the road, where it was stored. Mr. Benton and Miss Cronin testified that practically all of the articles in the fire which were moved to the Grove had cardboard tags tied on them, and that on these tags was marked the retail or selling price of the articles.

The next morning after the fire, Mr. Benton called the insurance brokers from whom the insurance had been purchased, and told them of the fire and where the stock had been stored. Apparently as the result of Mr. Benton's calls, a Mr. Scammon, who was an insurance adjuster for the companies, went out and looked at the stock, which was then all stacked up in the Grove. Mr. Benton and Miss Cronin testified that Mr. Scammon came out many times between the first and second fires, and that on these visits he would examine the stock, the invoices, and the tags on the stock.

In view of the importance of the testimony concerning these tags which it is claimed were on the different items after the first fire, and in order that an understanding be had of just what appellant claimed the figures on the tags represented, we quote from Mr. Benton's testimony:

"Q. All right. Now, what was on those tags that were attached to the furniture? . . . A. What was on the

tags? Q. Yes. A. We had the price of the furniture on the tags. Q. What price did you have on the furniture? A. We had the *retail price* of the furniture. Q. All right. Now, what relation if any did that retail price which you had marked on the tags bear to the *fair market value or cost* of that furniture to the Georgian House? . . . A. The price on the tag was the retail, and it was double the wholesale price. Q. What do you mean by 'wholesale price?' A. The wholesale cost. Q. In other words, the figure on these tags was double the cost to you? A. That is correct." (Italics ours.)

Appellant's exhibit 1 consists of the policies, with the exception of the Allemannia policy, upon which this action is based. Attached to and made a part of the exhibit is a list of articles claimed to have been damaged and lost in the two fires. The articles claimed to have been damaged and lost in the first fire are listed under a heading dated July 21, 1942, and those damaged and lost in the second fire under a heading dated August 7, 1942. The lists show first the article, then to the right a figure under the heading "Value," and to the right of that a figure under the heading "Loss."

Appellant's exhibit 2 is the proof of loss prepared by appellant and served on each of respondents after the first fire. Attached to and made a part of this proof of loss is the same list as that attached to exhibit 1, except as to the list under the heading of August 7, 1942, or the list claimed to have been damaged and lost in the second fire.

Appellant's exhibit 3 is the proof of loss prepared by appellant and served on each of respondents, except Home, after the second fire, and attached thereto is a list of articles the same as that contained in exhibit 1 under the heading August 7, 1942.

The list attached to exhibits 2 and 3 had the same value as to each article and the same amount of loss as appeared on the list attached to exhibit 1.

Mr. Benton testified that the articles set out in the list attached to exhibit 1 were in evidence after the fire, and were identified by Miss Cronin and himself in making up

the list. Counsel for appellant interrogated Mr. Benton in regard to the list attached to exhibit 1 as follows:

"Q. Now, how did you arrive at the figures that are set forth in the two columns at the right of this page; the first one is headed 'Value' and the second one is headed 'Loss?' A. We arrived at the value of the items which were in the first column. *That was arrived at by taking one-half of the figures on the tags.* Q. All right, now, where did you get the figures that you put on the tag? A. At the time we bought the merchandise we priced each item by figuring our cost price and adding to that our cost of our freight from the east or where it was brought from to Seattle and the extra shipment from Seattle to this place on the highway. So that the cost in each case was the cost delivered there. And that is where we got our cost price. And our way of doing business was to double our cost price and to mark our furniture and items and sale goods accordingly. And they were put on the tags. Q. Then the figures that were on the tag, as you said before, were double the cost price to you? A. That is right. . . . Q. What are the figures in the last column to the right of that page? A. That is our loss. It is the description and value and the last column is the loss. Q. The last column is the loss? A. That is right. Q. How did you arrive at the figures in that last column? A. Well, the loss is the difference between the value of the furniture before the fire and the value of the furniture after the fire, as it was in its damaged condition. Q. All right. Well, now, you used that method then in determining the amounts that you put in the second column, is that the idea? A. That is correct. Yes." (Italics ours.)

Miss Cronin's testimony as to what the figures on the tags represented, namely, the retail or selling price, and her testimony in regard to the value of the articles in exhibit 1 was practically the same as Mr. Benton's.

While Mr. Benton testified that Mr. Scammon was at the Grove, where these articles were stored, a good many times, and examined the damaged property, and on occasions referred to invoices and price lists, it is evident from the following examination of Mr. Benton that Mr. Scammon was not satisfied with the values claimed by appellant.

"Q. Now, while Mr. Scammon was out there, after the first fire, during the period that he was investigating the

matter, did you or did you not have occasion to refer to invoices and price lists? A. Yes, we did. There were some occasions. A. All right. How did those occasions arise? A. Well, Mr. Scammon—in his mind he didn't think that the value was there. And in those cases, that is as to what we had for the value of the furniture. Q. You mean on the price tickets? A. Yes. Then on those occasions Mr. Scammon had us refer to either the invoice or the price list to see if we were in line with the current market value."

Mr. Scammon was called as a witness for appellant, but only for the purpose of showing that he was representing respondents, as an adjuster, in inspecting the property. He was asked no questions as to what he saw or did during such inspection. It is not claimed that Mr. Scammon ever made any offer of settlement or compromise.

Sometime after the articles in the first fire were removed to the Grove, they were taken to another building a short distance away, known as the Circus Tavern, and it was while they were in this building, shortly after noon on July 23, 1942, that the second fire occurred. It appears from the testimony of Mr. Benton and Miss Cronin that they, together with Mr. Scammon, had been working in the building in the forenoon of the 23rd, inspecting the goods and records. Mr. Scammon left sometime during the forenoon, and about twelve o'clock Mr. Benton, Miss Cronin, and Mr. Marshall locked up the building and went down the road to get lunch. While they were at lunch, they were notified that the Circus Tavern was on fire. The fire was put out and the companies immediately notified. The next day Mr. Scammon came out and inspected the merchandise, and within a day or two the articles were again moved across the road to a building known as the Block House. Mr. Benton testified that Mr. Scammon was there when the goods were moved and checked the articles as they were taken out of the Circus Tavern.

After the second fire, the list which we have hereinbefore referred to as the list headed August 7, 1942, was made up and attached to appellant's exhibit 1. This list, according to Mr. Benton, was made up by establishing the identity of the pieces, and also with the aid of the list taken after the

first fire. Mr. Benton further testified that, on this list of articles damaged by the second fire, the term "value" was the value after the first fire and before the second fire; in other words, the value figures, as we understand it, represented what appellant concluded the market value of the article was after the first fire and before the second. The figures in the loss column would represent the difference in value of the article after the first fire and its value after the second fire, as determined by appellant.

The list last above referred to was attached to and made a part of appellant's proof of loss, exhibit 3.

The merchandise was apparently held in the Block House until about November 1, 1942, when it was disposed of by appellant, and the tags to which we have referred were, according to the testimony of Mr. Benton and Miss Cronin, left on the pieces when sold, so that no tags were produced at the trial. The witnesses last above named testified that after the second fire the price tags were so smoke damaged that it was impossible to read many of them.

The complaints in these actions were signed on November 2, 1942, which undoubtedly was before appellant had sold all of the pieces upon which price tags had been placed. It does not appear, however, that appellant kept any of the tags, or endeavored to get any of them.

■ The first question presented in appellant's brief is whether or not appellant sufficiently complied with the provisions of the policies, beginning with line 81, pursuant to which the assured, *as often as required,* shall exhibit to any person designated by the company, all the remains of any property described in the policy, and submit to examination under oath by any person named by the company and subscribe the same; and *as often as required,* shall produce for examination all *books of account, bills, invoices, and other vouchers, or certified copies thereof if the originals be lost,* at such reasonable place as may be designated by the company.

Appellant contends the record shows a complete compliance by appellant with the foregoing provisions, and to

sustain this contention, appellant states in substance as follows: (a) That Mr. Scammon, at the direction of respondents, went to the scene of the fire immediately after the fire, and was there several dozen different times during the period between the first and second fires, made a list of the merchandise damaged by the first fire, examined the furniture and records, and made an inventory; (b) that appellant's officers went to the office of Mr. Patterson, attorney for respondents, on September 4 and 16, 1942, for the purpose of submitting to examination under oath by such attorney, but Mr. Patterson refused to examine them, except under conditions improperly imposed; (c) that the books of account and other records of appellant were exhibited to and examined by Mr. Scammon over a period of approximately six weeks between the first and second fires, that appellant offered to deliver all of its books and records on September 4, 1942, to a Mr. Templeton, who was employed by respondents to examine them, and that all books and records of appellant were delivered at the office of Mr. Patterson on January 29th, and again on February 23, 1943, and on April 19, 1943, all of these books and records were delivered to John W. Sparling for examination on behalf of respondents, and kept by Mr. Sparling for approximately two weeks.

In view of what appears in this record, we seriously doubt that there ever was exhibited to Mr. Scammon books and records from which he could have determined, independent of additional statements made by appellant's officers, what the cost of any particular article was, when it was purchased, or from whom. In other words, we have grave doubts as to whether or not Mr. Scammon had much to guide him, other than the price tags on the articles after the first fire, which appellant claimed showed the retail price, which was double the cost to it.

But, assuming that Mr. Scammon made such an investigation as appellant claims he did, and that appellant permitted him to examine the property and furnished him such records as it had, that clearly is not a sufficient compliance with the provisions of the policies to excuse appellant after

demand made upon it to submit to examination under oath and produce for examination its books, records, etc., or certified copies thereof if the originals be lost, for the policies specifically provide that the assured, *as often as required,* shall submit to an examination under oath, and, *as often as required,* shall produce for examination all books of account, etc.

While it may be admitted that the examination required of an assured, and the demand for the production of the books and records, should be reasonable as to time and place, it would not seem that the provisions of the policies were substantially complied with on the part of assured by submitting to such an examination (not under oath) and inspection as conducted by Mr. Scammon.

One of the purposes of the provisions of the policies now under discussion is to give to the insurance companies an opportunity to determine *from the books and records* what articles were in the fire and the loss or damage occasioned thereby. In making such a determination, it is important that the company be able to determine from such *books and records* when the articles were purchased, from whom, and the amount paid therefor. This is especially true when, as appellant did in the instant case, an insured takes as a basis for determining its damage or loss the claimed net cost to it of the articles damaged.

In this case, after reading the record, we can readily understand why the respondents requested that appellant's officers submit to an examination under oath and produce for inspection all the books, records, etc., or certified copies thereof, for if Mr. Scammon did examine the books and records admitted in evidence he might well have questioned the values claimed by appellant and the loss claimed to have been sustained by it.

We now call attention to some of the things which appellant's books and records introduced in evidence show. Mr. Benton, on cross-examination, was interrogated in regard to a coffee table appearing as the first item on page 4 of the list of articles attached to exhibit 2, proof of loss by the first fire:

"Q. You have got in there this item, 'Coffee table, value $50.00.' That means that it cost you $50.00? A. That is correct. Q. And after the first fire you estimated that you could sell it for $30.00? A. That is correct. Q. So that you claim as a loss, $20.00? A. That is correct. Q. Now, you say that table cost you $50.00? A. That is correct. Q. It would have been sold by you for $100.00? A. That is correct. Q. Where did you buy the table? A. This one here? Q. Yes. A. Mr. Patterson, if I had the furniture here, I could identify each piece and where we bought it. But to take each piece off of a sheet of paper at this time and identify as to where we bought it, I couldn't do it. Q. You don't know where you bought it? A. That is correct. Q. Can you tell from the books where you bought it? A. No, sir. . . . Q. You don't know what kind of a coffee table it was and you don't know from whom it was purchased and you don't know the name on it? A. I did at the time we made that list. Q. But you don't know, now? A. I don't know now. Q. And you have no books of record from which you can determine that? A. No."

It may be admitted that Mr. Benton testified that he knew certain things at the time the list was prepared, which he stated at the time of trial the books did not show. This but emphasizes the fact that if the provisions in the policy mean anything they must contemplate that the books shall be so kept as to reveal the transactions without making it necessary to depend on the oral testimony of the assured, at least not to any considerable extent.

We desire to call attention here to the cross-examination of Miss Cronin, who was the bookkeeper, regarding the same coffee table concerning which Mr. Benton was examined:

"Q. I would like to have you refer, Miss Cronin, to exhibit 2. Starting at the top of page 4, there, there is an item '1 coffee table' in the first item, 'value $50.00.' Do you see that item? A. Yes, sir. . . . Q. Is there anything on these books, Miss Cronin, from which you can tell where that coffee table was purchased? A. No, sir. Q. Is there anything on the books from which you can tell when it was purchased? A. No, sir. Q. Is there anything on the books from which you can tell what you paid for it? A. These books, here, you mean? Q. Yes. A. No, sir. Q. Have you

got the invoice for it? A. There was an invoice, but *I don't know whether I could find it. I couldn't identify it with that coffee table, even if it were in the records.* Q. Well, I am compelled to ask the plaintiff and to ask the plaintiff through you, to produce the invoice if you can. A. I can't. Q. Now, would your answer be the same with respect to the second item, the '3 fire screens'? A. Yes, sir. Q. Would it be the same with respect to the third item, the chair? A. Yes, sir. . . . Q. And would it be the same with respect to all items on that page? A. I would say it would be the same with the exception of a customer's item, because their own value of the item—" (Italics ours.)

The witness further stated that, eliminating a few customer's items and the following items found on page 8 of exhibit 2 (proof of loss of first fire), to wit, moving cost, return moving cost, storage at the Grove, and labor rebolting piece goods, her answer would be the same in regard to all items listed in exhibit 2 as her answer in regard to the coffee table, hereinbefore set out. She also stated her answer in regard to the items listed in exhibit 3 (proof of loss of second fire) would be the same as her answer to questions in regard to the coffee table.

The only inventory prepared by appellant and filed herein is one dated January 3, 1942, and admitted in evidence as plaintiff's exhibit 5. The lists made up by appellant's officers after the first and second fires are sometimes referred to in the testimony as inventories, but they were not separately filed as such, and only appear as lists attached to exhibits 1, 2, and 3. The inventory (exhibit 5), according to Miss Cronin, shows all the stock on hand at that time. It shows first the article or number of articles, and to the right of each article listed are certain figures. Miss Cronin's attention was called to the first item listed in the inventory, "6 maple chairs, $110.00":

"Q. $110.00, as I understand the matter, is the retail selling price; the inventory was taken at the retail selling price? A. That is correct. Q. Now, can you locate that item for me in the proof of loss, exhibit 2? A. No, sir."

The witness's attention was then called to line 23, page 5 of the list attached to exhibit 2 (proof of loss of first fire),

where the following appears: "Set of 6 maple dining rm. chairs, value $110.00, loss $55.00." (The value of the article as shown on the list attached to exhibit 2 was, according to the testimony of Mr. Benton and Miss Cronin, one-half the retail price, as shown by the tags.)

"Q. Well, then, upon the inventory we have '6 maple chairs, $110.00,' and on the proof of loss we have a 'set of 6 maple chairs $110.00?' Is that right? A. That is right. Q. And those are the same items, aren't they? A. I have no way of knowing. There is a long lapse of time between this inventory and this one (indicating)."

Miss Cronin's attention was called to the small figure "17" to the left of the item of six maple chairs in the inventory (exhibit 5), and she was asked if the figure 17 was not given to the set of six maple chairs after the first fire, to which she replied that she did not know, as those were Mr. Benton's figures. Her attention was then called to defendants' exhibit 16, which purports to be a set of work sheets of some sixteen pages. These work sheets, according to Miss Cronin, were in Mr. Benton's handwriting. The first item listed on exhibit 16 is a coffee table, retail price $50.00. The first article listed under furniture, on page 4 of exhibit 2, proof of loss, is "coffee table," value $50.00, which value was supposed to be one-half the retail price. We have checked the entire list of furniture and lamps listed in exhibit 2, and the articles are identical with the articles listed on exhibit 16, and the value of each article as set out in exhibit 2, proof of loss, is the same as the retail price of the article set out in exhibit 16.

Referring again to the six maple chairs listed in exhibit 16 at the retail price of $110, and to the small figure 17 to the left of the item, and to the item in the inventory (exhibit 5), six maple chairs, retail price $110, Miss Cronin was asked to explain how it happened that six maple chairs were listed in the inventory (exhibit 5) and in exhibit 16 at the retail price of $110, and in the proof of loss at $110, which it was claimed was the cost of the article to appellant. Her only explanation was that she had no reason to believe they were the same chairs. Other items in the inventory and exhibit

16 and in the proof of loss were called to Miss Cronin's attention, the value as set out in the proof of loss being the same as the retail value listed in the inventory and exhibit 16, and her only explanation was that she did not know they were the same articles.

It seems to us the record before us almost conclusively shows that the values of the articles listed in the proofs of loss were not in fact the cost to appellant, but represented what it claimed was its retail or selling price.

Miss Cronin did not purport to know very much about exhibit 16, the work sheets; however, Mr. Benton testified that he wrote out the work sheets covering the furniture, and, being asked how the information on these sheets was procured, answered:

"Miss Cronin inspected the furniture tag, read the tag off, named the item, 'one coffee table' and she read, as I presume, the price of the table and she read me the wholesale price which I wrote down."

Mr. Benton further testified that he assumed Miss Cronin was reading to him the retail price as shown on the tags, and that he put in the value given him by Miss Cronin as the retail price. He stated that he thought something was wrong when he totaled up the value of the furniture, and he then examined the tags himself and found that Miss Cronin had not read him the retail price, but had divided the price on the tags and was in fact reading to him the wholesale price.

As we have stated, none of the tags was produced, so we do not know what figures may have been on them, other than as testified to by Miss Cronin and Mr. Benton. However, assuming that the mistake was made in making exhibit 16, as stated by Mr. Benton, we still have the inventory (exhibit 5) showing at least several articles of the same name as those listed in the proofs of loss, and showing the retail value in the inventory the same as the claimed cost in the proofs of loss. No officer of appellant could or did testify that certain articles called to the attention of the witnesses and listed in the inventory at the retail price were not the same articles as those listed in the proofs of loss at the same

value, nor was it possible for appellant to show from the books that they were not the same.

Let us now refer to defendants' exhibit 10, which is a loose leaf book of accounts, and contains, among other accounts, the following: "Inventory—Merchandise," "Sales—Merchandise," and "Purchases." Under the account "Inventory—Merchandise" appears an item "Nov. 1, 1941, Inventory, $11,487.26," representing the cost to appellant of merchandise on hand at that time. Under the account "Purchases," it appears that appellant bought additional merchandise between November 1, 1941, and May 31, 1942, at a cost to it of $5,582.63, which would make the total cost to appellant of goods on hand on November 1, 1941, plus goods purchased up to May 31, 1942, of about $17,000. Under the account "Merchandise Sales," it appears that between November 1, 1941, and May 31, 1942, appellant sold merchandise for which it received approximately $18,392.13. After deducting the sales tax, and assuming that the selling price was double the cost price to appellant, we have the cost of the articles sold between the above dates approximately $8,750. Assuming that the books are correct, appellant, according to the books, could not have had on hand on May 22, 1942, the date of the first fire, goods which had cost it more than $8,250, or approximately that amount.

However, when Miss Cronin was confronted with these figures, she stated that the inventory as shown on the books was not correct, and was only an estimate, that it was clearly wrong, and that the inventory taken January 3, 1942, was correct. However, no change was made on the books. The books do not show under the accounts, "Inventory," "Merchandise Sales," or "Merchandise Purchases," any item sold or purchased, neither do they show from whom any article was purchased, or the amount paid. There are only entries as cash items.

While perhaps some of the testimony hereinbefore set out would have been more properly discussed in connection with the iron-safe clause, we are of the opinion it was appropriate to state it at this time, as it probably indicates to some extent what Mr. Scammon discovered in his investiga-

tion, and undoubtedly had much to do with the next move on the part of respondents, which was to demand that appellant's officers submit to an examination under oath, and produce for inspection its books of accounts, records, etc.

The first attempt to procure such an examination and inspection was held in the office of Mr. Patterson, attorney for respondents, on September 4, 1942. The proceedings of this meeting and a subsequent meeting held on September 16, 1942, are shown by defendants' exhibit 35. At the meeting of September 4th, Mr. Marshall, Mr. Benton, and Miss Cronin appeared. Mr. Patterson asked that they be examined separately, but in the presence of their counsel. Mr. Crandell, attorney for appellant, refused to permit this to be done, but stated that the officers were there and willing to be examined, though not separately. There was much argument between counsel over this matter, but no agreement was reached, and, as a result, Mr. Patterson refused to examine the officers.

We find nothing in the policies which would seem to require a separate examination of the above officers over their objection. While Mr. Crandell stated that all of the books were there, it appears from the record that there was considerable quibbling over words, that is, what was meant by books and records, etc., for it appears that appellant's officers did not bring with them all the books of account, records, bills, invoices, or certified copies of those claimed to have been lost. Mr. Crandell further stated that, in addition to what was produced, there was a large volume of records, some original invoices which had been burned or destroyed, and other records out at the plant. He suggested that it would be expensive to bring them in, and that Mr. Patterson go out to the plant if he wanted to examine them. It further appears that Mr. Crandell thought the examination made by Mr. Scammon was a sufficient compliance on the part of appellant. Mr. Patterson asked Mr. Crandell the following question:

"Now, have you got a set of books showing a complete record of business transacted, including all purchases and sales both for cash and for credit?"

Miss Cronin answered "Yes." Mr. Patterson then asked "Where is it?" to which Miss Cronin replied "Right there (indicating)." The record does not show what books Miss Cronin referred to. However, we have been unable to find any books or records which furnish the information asked for by Mr. Patterson, and none was produced at the trial. We assume Miss Cronin referred to exhibit 10, hereinbefore referred to, and exhibit 11, to which we shall later refer.

Mr. Crandell admitted that through his oversight certain books and records were not brought in, among them the minute book and the inventory. So far as we have been able to determine, no invoices from which any article claimed to have been lost or damaged might be identified was ever produced, nor were certified copies produced.

Nothing further seems to have occurred at the meeting of September 4th.

We now come to the meeting of September 16th, held at the office of Mr. Patterson, pursuant to a letter (defendant's exhibit 18) written by Mr. Patterson to Mr. Crandell. There can be no question but that this letter asked that Mr. Marshall, Mr. Benton, and Miss Cronin appear on September 16th, for the purpose of examination under oath; that at such time and place there be exhibited and made available to Mr. Patterson

" . . . *all* of the books of the insured, including but not limited to in addition to the books which have already been exhibited, the corporate minute books of the company, and all inventories if any of merchandise on hand taken while the policies of insurance involved herein were in effect; . . . " and

" . . . that (likewise at the time hereinafter fixed for said examination) there be produced the original invoices covering the purchases by the insured of each of the articles in respect to which loss is claimed, or certified copies of such invoices, in the event the originals are no longer available."

The letter further stated:

"We assume that these invoices when produced will disclose the name of the concern from whom the articles cov-

ered by the invoices were purchased, the date of the purchase, and the purchase price. If they do not, we desire and demand that there be produced any other documents including but not limited to bills or vouchers which will give us the above information."

On September 16th, Mr. Benton and Miss Cronin appeared.

It is apparent that no invoices were produced for examination at this hearing, for Mr. Crandell stated:

"Now, the invoices,—there are still in existence a number of invoices out there at the place where they are now. What is that place? MR. BENTON: The Block House. MR. CRANDELL: —where Mr. Patterson and Mr. *Scanlon* have examined some remnants of the furniture remaining after the last fire. They can be examined at any time. There are a number of books,—not books, but records and so on, card indices and various matters of that kind that pertain to the business of the company, all of which, however, are recorded in the *permanent records that we have here in books.*" (Italics ours.)

Mr. Patterson insisted that respondents were asking that the books and records called for be produced. Mr. Crandell stated that appellant had complied. Mr. Crandell then endeavored to show by Miss Cronin what books were there, and, as near as we can tell, the books produced were defendants' exhibits 10 and 11. While the witness did not refer to any numbered exhibit, we assume the second book shown her was defendants' exhibit 11, for she stated that this book included four entries: cash journal, check register, sales, and journal. Exhibit 11 contains these entries, and we assume the other book referred to is exhibit 10, to which we have hereinbefore referred.

While we have stated that Miss Cronin was the bookkeeper, it seems that a Mr. Nadeau, of Tacoma, supervised the bookkeeping, and that he, in fact, made the entries, or most of them, appearing in exhibit 10, while Miss Cronin, with a few exceptions, made the entries in exhibit 11. Mr. Nadeau was not called as a witness. In addition to exhibits 10 and 11, there may have been a check register produced, but we cannot tell from the record whether that was an in-

dependent book or the check register contained in exhibit 11. The inventory of January 3, 1942 (exhibit 5) was also produced at this meeting. No invoices or certified copies of those claimed to have been lost were produced.

There can be no question from the record but that appellant failed to produce, for respondents' inspection, books, records, invoices, etc., to which respondents, under the policies, were entitled. This, appellant failed to do not only once, but twice.

It is apparent from the books and records produced that respondents could not tell when any article set out in the proof of loss was purchased, from whom it was purchased, or the price paid therefor. Nor do the books show when, to whom, or for what amount any article listed in the inventory was sold.

The demands made upon appellant to produce were, in our opinion, fair and reasonable, under the facts in this case, and we are further of the opinion that appellant not only failed to comply strictly with the provisions of the policies, but failed to comply substantially therewith. It never did produce original invoices which purported to show from whom any article in the proofs of loss was purchased. It attempted to explain its failure to produce these invoices by stating that some of them were lost or destroyed, and that it would have been impossible to get certified copies thereof, as some of the merchandise was purchased in Europe. But admittedly much of the merchandise was purchased in this country, and it does not appear that any effort was made to procure certified copies of such invoices, assuming that they had been lost. It appears all through the record that appellant sought to be the judge of what books and records were sufficient to comply with the provisions of the policies, and what books and records it was required to produce.

It is not for appellant to say that, because, as testified to by its officers, it permitted Mr. Scammon, the adjuster, to examine the merchandise claimed to have been damaged by the fires and to examine some of its records, such inspection and examination was a substantial compliance with the provisions of the policies, and an excuse from a further pro-

duction for inspection of all the books of account, records, invoices, etc., after a proper demand made upon it. To sustain its contention of substantial compliance, appellant submits only one authority, namely, 26 C. J., p. 251, § 317, note 63, to the effect that substantial compliance is all that is necessary. Appellant then states that the case of *Ward v. Nat. Fire Ins. Co.*, 10 Wash. 361, 38 Pac. 1127, cited by the trial court in its memorandum decision, is not in point, as in the cited case there was a complete destruction of the stock of goods covered by the policy.

It is true that in the cited case no representative of the insurance company ever inspected or examined the goods claimed to have been destroyed by the fire, as apparently the only contact between the assured and the company after the fire and before suit was instituted was by correspondence, but, nevertheless, we are of the opinion the rule announced in the cited case is applicable here. In that case the only question presented was whether or not the insured had substantially complied with provisions of the policy almost identical with the provisions here under consideration, referred to as beginning with line 81. Upon receipt of proof of loss, the insurance company wrote the insured, stating that, as assured had stated that his books of account, bills, receipts, and vouchers had been burned in the fire, the company, under the conditions of the policy, was compelled to ask him to produce certified copies of bills, invoices, and other vouchers in support of his claim, at the company's office in Seattle. The assured, in answer to the above letter, wrote the company that it was practically impossible for him to comply with its request, and that he could not see what would be gained by complying with the request, as he had furnished conclusive evidence that at the time of the fire he had more goods than the insurance called for. The company then wrote the assured, calling his attention to the terms of the policy. The assured made no further attempt to comply with the company's request. In the cited case we quoted from *O'Brien v. Commercial Fire Ins. Co.*, 63 N. Y. 108, as follows:

" 'Where a policy of fire insurance upon a stock of goods contains a clause providing that the assured will, if required, produce as part of his proofs of loss certified copies of all bills and invoices, the originals of which have been lost, a failure to comply with the condition will defeat a recovery upon the policy in the absence of proof of waiver or of inability, without fault of the insured, fully to perform.' "

The opinion continues:

"And we think this is the uniform law on the question. In fact, we have been unable to find any authority opposed to this proposition."

Then, after stating that some courts have held it was the absolute duty of the insured to comply with the provisions of the policy, and that a failure under any circumstances would be a defense to the action, the opinion continues:

"We think this is carrying the rule too far, but it certainly must be conceded that the provision set forth in the policy in this case is a reasonable one, and the insured should be required to comply with it, if possible. *This is a provision for the benefit of the insurer, to prevent it from being imposed upon by scheming and dishonest men; a provision which they have a right to incorporate in their policy and a very necessary one for their protection.* . . . It is true that, according to his [insured] testimony, he would not have been able to have obtained invoices of the goods that he purchased for cash, but it appears that there was absolutely nothing to prevent him from obtaining the invoices and bills of goods that he had purchased on credit; *and it can reasonably be understood that a copy of those bills would have been of incalculable benefit to the assurer in determining whether or not the claim was a just one.*

"And it is not for the assured in the face of such an agreement, to determine that because he cannot furnish all the proof that is required, he will refuse to furnish any. . . . In fact, the insured seems from the start to have cavalierly settled this question, both for himself and the other party to the agreement. He stated in his correspondence that he could not see what would be gained in furnishing these data, if it were possible; then announces that he furnished what he supposed would be conclusive evidence that at the time of the fire he had more goods than the insurance called for, *evidently resting upon the proof that he had furnished outside of this requirement. It might have been conclusive*

*evidence, but, inasmuch as he and the appellant had stipulated what kind of evidence should be required, it was his duty to furnish that evidence if possible, and as far as possible."* (Italics ours.)

The judgment of the lower court was reversed, with instructions to grant the motion for nonsuit. We have been unable to find any case decided by this court which in any way changes or modifies the above rule.

We do not desire to be understood as holding that appellant furnished no books or records for the inspection of respondents, but we are, by this record, forced to conclude that appellant did not produce for respondents' inspection, after a demand made upon it so to do, the books, records, bills, and invoices it claimed to have in its possession, nor did it make any attempt to obtain and produce certified copies of invoices or bills claimed to have been lost or destroyed, but to the contrary appellant insisted that it had produced books and records to comply sufficiently with the provisions of the policies.

Under the terms of the policies, respondents were clearly entitled to an inspection of *all books of account, bills, invoices, and other vouchers, or certified copies thereof if the originals be lost, as often as required.* Appellant admittedly did not comply with the demand on the part of respondents to produce such books, bills, invoices, etc., nor in our opinion does the record show any sufficient excuse for not complying with the demand, and we therefore conclude that the trial court correctly held, as a matter of law, that the challenge to the sufficiency of the evidence must be granted.

■ We now come to the second question presented, which is whether or not there was a substantial compliance by appellant with the provisions of the iron-safe clause.

The so-called iron-safe clause is a standard clause, and is attached to and made a part of practically all fire insurance policies on shifting stocks of merchandise. The authorities seem quite universally to hold that a substantial compliance with the provisions of such a clause is all that is required on the part of the insured. It seems also to be quite universally held that no particular system is required, so long as the

books and records kept are sufficient to furnish the information required by the terms of such provisos.

While appellant contends that it did keep books and records, which were produced and examined by respondents, it is also stated by appellant and contended that, even if appellant had failed to keep any books or records whatsoever, it should not be denied recovery herein for the loss suffered, because in this case the merchandise involved was only damaged, was in evidence and subject to appraisement, and a determination of the amount of the loss suffered could be accurately ascertained by such appraisal, and, in addition, the merchandise was exhibited to and extensively examined by the adjuster, Mr. Scammon, for the companies.

In regard to appellant's contention that the goods were only damaged, we call attention to page 8 of the list attached to exhibit 2, proof of loss of the first fire. This page is headed "Items Lost," and listed thereunder are some sixty-four items. A total loss is claimed on practically all the articles listed on page 8.

Provisions such as those contained in the iron-safe clause here under consideration have been universally held by the courts to be a fair and reasonable protection to the insurance companies against exaggerated and fraudulent claims. While, as we have said, there need be only a substantial compliance, there must be sufficient written evidence to enable the insurance company to determine with accuracy the amount of the liability. The insured must keep his books in such a manner that they shall constitute a record of business transactions which a person of ordinary intelligence accustomed to accounts can understand. See *Price v. Century Indemnity Co.*, 333 Pa. 337, 5 A. (2d) 130, and cases therein cited.

In the cited case, the assured offered in evidence such books as he kept, but there was considerable controversy, both by witnesses and counsel, as to whether the amount of the alleged loss could be ascertained from them. The plaintiff's accountant admitted that the records were not sufficient to enable him to determine the individual items of jewelry said to have been involved in the robbery, and

that it was only from plaintiff's memory that such identification could be made. He attempted to calculate the total amount of loss on the basis of an average rate of profit made by the plaintiff in preceding years, *but the information which the books furnished for the ascertainment of that rate was apparently not sufficiently detailed to assure reasonable accuracy.*

The cited case also quotes from Cooley's Briefs on Insurance (2d ed.), vol. 3, p. 2818:

" 'No particular method of bookkeeping is required, but the books must themselves furnish the information with reasonable certainty, unaided by oral testimony, except . . . to explain the method of keeping them.' "

In the instant case, appellant's officers admitted that they could not identify a single item contained in the proofs of loss from the books and records produced and admitted.

In *Lucille Ladies' Ready-to-Wear v. Glens Falls Ins. Co.,* 168 La. 696, 123 So. 295, the court held that, where an inventory was required to be taken and kept, the terms of the policy were not substantially complied with by keeping a stock book. The court stated that there was no doubt that the stock list furnished the information from which an accurate inventory could have been made, but the stock list was not an inventory, such as the policy contract called for.

Cooley's Briefs on Insurance (2d ed.), vol. 3, p. 2796, has the following to say in regard to the provisions of the standard iron-safe clause:

"The object of the clause is to facilitate the ascertainment of the extent of the loss. [Citing cases.] One of the purposes of the iron-safe clause is to prevent the perpetration of fraud by the insured as to the quantum and value of the goods destroyed. . . .

"It is a perfectly reasonable condition, is valid, and is binding on the assured, in the absence of fraud. [Citing many cases.]"

There is a multitude of authority on the question of substantial compliance, each case apparently being decided upon its own particular facts, having in mind the general rules hereinbefore stated.

In the case of *Albert v. Colonial Fire Underwriters,* 86 W. Va. 204, 102 S. E. 859, the only question presented was whether or not the plaintiff's evidence showed a substantial compliance with the iron-safe clause. The policy provided that the insured should keep a set of books "which shall clearly and plainly present a complete record of business transacted, including all purchases, sales and shipments, both for cash and credit, from date of inventory." The court held that the assured had failed to comply with the above provision. The opinion states:

"Plaintiff's only method of keeping an account of sales was by means of slips, on which each sale was noted, and at the end of each week the total amount of sales for the week was ascertained, and the total then transcribed simply as a cash item, into a book kept for that purpose. This book was produced. . . . The facts in this case are very similar to the facts in the case of *Fisher v. Sun Insurance Co.,* 74 W. Va. 694, wherein we held that such method of keeping accounts and such means of supplying an inventory of the stock of goods did not show a substantial compliance with the Iron Safe Clause, and, therefore, avoided the policy."

At this point we desire to call attention to defendants' exhibit 11, which book, together with exhibit 10 and the inventory (exhibit 5), appellant contended sufficiently complied with the iron-safe clause. Miss Cronin's attention was called to the first entry appearing under the general title "Sales," of March, 1942, where we find the name Beckem, and to the right, under a column headed "Accounts Receivable," an entry of $1,500. Miss Cronin stated that the $1,500 represented a charge made for merchandise sold prior to the date of the entry. She could not tell from the book how long prior to the date of the entry the property had been delivered to the customer—it might have been a month and it might have been longer. The same was true in regard to other items in this book showing sales. Miss Cronin further testified:

"Q. This is the only record of your sales, isn't it, this record we just had in this book? A. That is the only record that I kept of the sales. And then, for our convenience, those little card records. There are other records of sales in that other book [no book identified]."

Miss Cronin was then asked where the record of purchases could be found, and she stated in the check register, which is also part of exhibit 11. She stated the entries therein were simply a record of checks issued in payment of merchandise. No itemized list of the articles purchased or sold appears upon these books; all that is set out is the totals of merchandise claimed to have been purchased and the totals of merchandise sold. None of appellant's officers were able to identify any article on the inventory of January 3, 1942 (exhibit 5) with any article on the proofs of loss, nor was any officer of appellant able to identify any article on the proofs of loss by any of the books or records produced, or tell from whom purchased, when purchased, or the price paid therefor; nor were they able to tell from the books what articles were sold between the time the January 3rd inventory was made and the fire, or what articles purchased.

It is admitted on page 41 of appellant's brief that the books kept do not show the individual sales, the entries reflecting sales being in the form of lump sums in cash received and deposited by appellant, and, except for invoices, the same procedure was followed in recording purchases, the record consisting of payments made for purchases in the form of company checks. While the officers of appellant testified that the figures on the tags attached to the articles, and which it is claimed were in evidence after the first fire, represented the retail price, which was double the cost price, it is also admitted on page 42 of appellant's brief, and the evidence shows, that the figures on these tags were sometimes increased to reflect the advance in the market value of the articles. It is thus apparent that, at least in some instances, the figures on the tags did not represent double the net cost to appellant. The net cost of the articles to appellant becomes very material in this case, for while we may assume, as contended by appellant, that the basis of its claim for damages is the fair market value of the article damaged or destroyed àt the time of the fires, appellant, on page 272 of the statement of facts, adopted as such basis the

net price of the article to it, or, as stated by Mr. Crandell, "the cost of the stuff to us on our floor."

In the case of *Security Nat. Fire Ins. Co. v. Schott Drug Co.*, 129 S. W. (2d) (Tex. Comm. App.) 632, after referring to the case of *Home Ins. Co. v. Flewellen Produce Co.*, 247 S. W. (Tex. Comm. App.) 833, the court stated:

"The opinion in no wise supports the contention, however, that the bookkeeping requirement has been substantially complied with by the assured when the record of business kept and *preserved for examination by the insurer after the fire,* reflects only the totals in *value* of the goods added to and taken from the stock insured. . . .

"The requirement as a matter of law is not fulfilled when the books present a record of *values* only that are added and taken away. The object of having an itemized inventory and of keeping in the course of business a record of *property* added and taken away 'was not to ascertain the gross value of the property insured, but to ascertain the different articles which went to make up the stock in order that the insurance company might test the correctness of the claim' of the assured."

See, also, *Globe Indemnity Co. v. Cohen,* 106 F. (2d) 687.

From a reading of the record and an examination of the exhibits, we are convinced that appellant failed to comply substantially with the provisions of the iron-safe clause.

It is admitted that there are errors in the books, and it is also claimed that exhibit 16, the work sheet, does not disclose the retail price as stated in the exhibit. The officers of appellant were unable to identify any article on the proofs of loss from the books and records, or to tell from such books and records what any article set out in the proofs of loss cost, or from whom or when purchased. When confronted with some of the items in the proofs of loss and the value there shown, which these officers had testified represented the cost to appellant, or one-half the retail price, they could not tell whether such article was the same article mentioned in the inventory. No invoices were ever produced from which appellant's officers could identify any article on the proofs of loss. Promises were

made to produce books and invoices that would show a complete record of business transacted, including all purchases and sales, both for cash and for credit, but this was never done.

We are of the opinion that appellant, in permitting Mr. Scammon to inspect and examine the damaged property after the fires, is not released from substantially complying with the provisions of the policies relative to keeping a set of books. The policies provide what the insured shall do to be entitled to maintain a claim of loss under the policies, and appellant should not be allowed to show that some other method was used which, in the opinion of appellant, furnished respondents all the information which a set of books properly kept would have provided.

We call attention again to the fact that, while undoubtedly some of the tags on the furniture were in appellant's possession after this suit was started, appellant did not see fit to save any of them so they could be produced for inspection or at the trial.

Appellant cites the case of *Port Blakely Mill Co. v. Springfield Fire & Marine Ins. Co.,* 59 Wash. 501, 110 Pac. 36, 28 L. R. A. (N. S.) 596, to refute the claimed contention of respondents that the provisions of the iron-safe clause should be strictly and literally enforced. We do not understand that respondents are contending for other than a substantial compliance, but, in any event, we have concluded that all that is required is substantial compliance. In addition, the cited case is not, in our opinion, applicable to the instant case.

Appellant also cites *Hartford Fire Ins. Co. v. Sullivan,* 74 Okla. 241, 179 Pac. 24. The policies under consideration in that case involved no iron-safe clause, in so far as appears from the opinion. The question decided in the cited case is shown by the following headnote:

"Where a loss occurs of property covered by an insurance policy in the standard form adopted by this state, and the insurance company enters into an agreement with the insured, by which the amount of the loss is duly determined by arbitrators duly selected pursuant to the terms of the

policy, without any demand being made by the insurance company for proof of loss required by the policy, *the insurance company will be deemed to have waived the furnishing of such proof of loss."* (Italics ours.)

As indicated above, the question was whether or not the company had waived the furnishing of proof of loss. We are in accord with the decision in the cited case, and with the quotation therefrom set out in appellant's brief, but in our opinion the case is not applicable here. There was no waiver on the part of respondents in the instant case of any of the provisions of the policies.

The case of *Dickey v. Springfield Fire & Marine Ins. Co.,* 56 Okla. 616, 156 Pac. 204, cited by appellant, is not applicable herein, for the reason that according to the opinion it was not contended that the data furnished by the insured did not practically show the loss sustained by the insured. No such facts were admitted in the instant case.

Appellant then cites several cases following this statement in its brief:

"The clause (iron-safe clause) is intended to protect the defendant against excessive claims, and it is not available to defeat a claim *the amount of which is not in dispute."* (Italics ours.)

While the above statement alone would indicate the cases cited thereunder were not applicable here, as the amount of the loss is certainly in dispute in the instant case, we call attention to one case as typical: *Michler v. New Amsterdam Cas. Co.,* 104 N. J. L. 30, 139 Atl. 725. In the cited case, the insured operated a small restaurant. Two men entered the place, bound, gagged, and tied the insured, and took from his person $450 in cash and $50.30 from the cash register. The loss was immediately reported to the police and the insurance company. The insured could not read or write, which fact, the opinion seems to indicate, was known to the insurance company. The insured kept no books, nor did he have a bank account, but apparently kept all the money he took in either on his person or in the cash register. The court stated that the meaning of the provision relative to keeping books is that, *when it becomes necessary*

*to determine accurately a loss by robbery, and it appears that the keeping of books and accounts is material and necessary in order to attain that end, then in such a case the failure to have complied with the provision of the policy relative to keeping books and accounts operates to defeat any liability for loss on the part of the company.* The court continued:

"There is nothing before us in the case *sub judice* that tends to show that the keeping of books and accounts by the assured was material or would have been in the least helpful and necessary to accurately determine the loss of the assured, sustained by him as a result of the robbery."

Clearly, the rule above announced is not helpful to appellant in the instant case.

After a consideration of the record, and having in mind the rule relative to the consideration to be given to the evidence submitted by appellant, we are of the opinion that the evidence submitted by appellant, considered in the light most favorable to appellant, fails to show that it has substantially complied with the provisions of the iron-safe clause. This being true, the trial court was justified, as a matter of law, in sustaining respondents' challenge to the sufficiency of the evidence.

The judgment of the trial court is affirmed.

SIMPSON, C. J., BEALS, STEINERT, and GRADY, JJ., concur.

October 21, 1944. Petition for rehearing denied.