[Civ. No. 25124. Second Dist., Div. Three. Jan. 24, 1962.]

S & M LAMP COMPANY, Plaintiff and Respondent, v. LUMBERMENS MUTUAL CASUALTY COMPANY, Defendant and Appellant.

Maurice H. Wallbert for Defendant and Appellant.

Irmas & Rutter for Plaintiff and Respondent.

FORD, J.—The defendant has appealed from a judgment rendered against it in an action upon a policy of fidelity insurance. The trial court found that "on or about the weekend of July 4, 1957, Ben Stevens and Eugene Stevens, who were then in the employment of plaintiff," appropriated to themselves certain items of the plaintiff's personal property without its consent. While the loss was alleged to be in the amount of $7,500, recovery was allowed only with respect to certain of the articles alleged to have been taken and the judgment was for the sum of $3,483.

With respect to any matter of fact upon which the trial court's determination rests, this court must view the evidence and the inferences which find reasonable support therein in the light most favorable to the plaintiff as the prevailing party in the court below. The facts which must be considered in the disposition of this appeal will be stated in that light.

In 1956, two brothers, Ben and Eugene Stevens, and their nephew, K. R. Corbin, were associated together as partners in a foundry business in Gilroy, California. In the latter part of that year, they sold a quantity of items of foundry equipment and machinery to the plaintiff. As part of the consideration for the transfer of such property, the plaintiff agreed to take certain action with respect to the financial affairs of the Stevens brothers and to give them employment of a substantial nature in Los Angeles.

At the time of the transaction, the plaintiff received a copy of an inventory of the personal property involved. That copy, together with other papers, was given to Ben Stevens by the plaintiff's president in the early part of 1957 to be delivered

to the plaintiff's attorneys, but the attorneys never received that document and it was not thereafter located. The items of machinery and equipment shown in the inventory had not been entered in any other records of the plaintiff. The contents of the plaintiff's lost inventory were the same as those of the copy of an inventory produced at the trial by Mr. Corbin and which was received in evidence.

After the sale the Stevens brothers and Corbin were employed by the plaintiff. Corbin worked from November 1956 until about May 1957. He voluntarily terminated his employment, one of his reasons for doing so being that Ben Stevens ordered him to load onto a common carrier certain ingots which belonged to the plaintiff and not to Ben Stevens. When Corbin was last on the plaintiff's premises in May 1957, all of the machinery and equipment listed in the inventory was on hand.

Until about July 1957, the plaintiff's foundry was in north Long Beach on premises leased from a Mr. Frantz. Corbin and the Stevens brothers worked there, Ben Stevens being in charge. Aluminum casting work was done at that location. Without the plaintiff's knowledge or consent, the brothers also did some foundry business for themselves under the name of "Morgan Hill Foundry" or a similar name. Ben and Eugene Stevens had access to each of the plaintiff's several plants and premises. From time to time one of them would take some of the equipment from its place of storage in Los Angeles for the purpose of removing such property to the Long Beach premises. Mr. Anderson, the plaintiff's production manager, noticed that a large band saw, which had been in storage in one of the plants, had disappeared. In the middle part of 1957, Mr. Anderson received a report from Mr. Frantz concerning the possibility that there had been thefts by the Stevens brothers. At approximately that time Mr. Anderson noticed a discrepancy in the inventory of aluminum. The information from Mr. Frantz was received about the period when the plaintiff was scheduling the removal of its personal property to its North Spring Street location, with which project the Stevens brothers were to help.

. In the week after July 4, 1957, Mr. Frantz saw a truck of a common carrier at the foundry. During the preceding week, after he had heard some conversation about the theft of ingots from the premises, he had counted the number of ingots there and it was 66. About three-fourths of those ingots

were loaded on the truck, Ben Stevens personally doing part of the work. In addition, metal flasks and other articles were placed on the vehicle. Mr. Frantz was not certain whether only a rip saw or both a rip saw and a band saw were also taken.

In September 1957, Mr. Anderson made a trip to Gilroy and Morgan Hill. He found a good portion of the missing equipment stored in a semideserted building in the area of Morgan Hill. When he returned to Los Angeles, he prepared two documents; one was entitled "Statement of R. B. Anderson" and the other "Affidavit of R. B. Anderson." It was stipulated that such documents were sent to the defendant on October 17, 1957. At the time of the trial, Mr. Anderson did not recall the items of equipment he had seen at Morgan Hill. However, in the affidavit he had stated the particular items of property which he had observed there. That affidavit was received in evidence without objection and without limitation as to the purpose for which it could be considered. (*Cf. Crocker-Anglo Nat. Bank* v. *American Trust Co.*, 170 Cal.App.2d 289, 299 [338 P.2d 617].) A portion thereof is set forth in the footnote.[1]

The only other documents relating to the nature and extent of the claimed loss which were submitted to the defendant by the plaintiff consisted of two statements in invoice form, each being dated December 2, 1957. Therein were listed various items of property claimed to be missing, with an amount in

---

[1]The affidavit was in part as follows:

"Following is a list of some of the equipment seen by affiant in the above described premises in Morgan Hill, California, at approximately 3:00 o'clock p. m. Saturday, September 21, 1957, and recognized by affiant as the property of S & M Lamp Co.:

1—24" heavy duty band saw
1—125 lb. working pressure air compressor, complete with tank and controls
2—14" impeller type foundry blowers
1—large-size foundry grinder or polishing lathe, complete with rubber wheels to receive sanding drums, and pedestal mounting base
1—1 h.p. #1750 rpm heavy duty motor
4—fractional h.p. 1750 rpm motors
6—very good aluminum snap flasks—approximately 12" x 14"
1—large aluminum snap flask with extension, approximately 14" x 18"
6 or 8 large steel flasks used in the manufacture of merry-go-round horses

A general assortment of bottom boards (all for the horse flasks were there), welding rods, and a general assortment of various equipment previously seen by affiant in storage in S & M Lamp Co.'s Plant No. 3, but unknown by name to affiant."

dollars opposite each item. Those documents were received by the defendant on December 10, 1957, and were accompanied by a letter of transmittal from the insurance broker or agent through whom the plaintiff had obtained the insurance. The total loss claimed was in the amount of $7,368.82. Mr. Mattison, the president of the plaintiff corporation, testified that such documents had been prepared under his direction. He stated that he was reasonably familiar with the prices and values of equipment and machinery used in foundries. The amount placed opposite each item represented the fair market value thereof as of December 2, 1957, and such value was, in his opinion, at least the same in amount in July of 1957. He further testified that in the mid-part of 1957, the plaintiff moved its personal property from several locations in Los Angeles and from the foundry in Long Beach to its premises at 1700 North Spring Street in Los Angeles; the items which did not arrive at the new location were taken to be the missing items.

In its findings of fact, the trial court set forth the items of property taken by the Stevens brothers and the fair market value thereof as follows:

| | |
|---|---|
| "1 24" band saw | $500.00 |
| 1 air compressor | 750.00 |
| 7 aluminum flasks | 700.00 |
| 5 motors | 275.00 |
| 6 steel flasks | 742.00 |
| bottom boards | 200.00 |
| table band saw | 250.00 |
| 50 ingots of alum. at 22 cents a lb. | 66.00" |

Preliminarily it is to be noted that the item of $66 with respect to the aluminum ingots finds no sufficient support in the record. While there was evidence that the market value of such ingots was 22 cents a pound, there was no evidence as to the weight of the ingots which were taken. But the more difficult problem, with which this opinion is principally concerned, relates to the other items for which recovery was allowed. That subject will now be examined.

Several grounds of attack upon the judgment have been stated by the defendant. All have been considered. One appears to be determinative of this appeal, that contention being that because verifiable property records were not kept, no recovery by the plaintiff can be sustained. In the policy it is stated that the insuring agreements and general agree-

ments are subject to certain conditions and limitations thereinafter set forth. One provision so set forth is as follows: "The Assured shall keep verifiable records of all property covered by this Policy." The language of that provision was contained in the fidelity insurance policy considered in *Miller v. American Bonding Co. of Baltimore* (Mo.) 319 S.W.2d 530. Therein the reasoning of the Supreme Court of Missouri was as follows (page 534): "Provisions, such as we have in the instant case and those substantially similar in fire, burglary and theft insurance, are valid and enforceable and failure to substantially comply with them may preclude recovery. Such provisions should be given fair interpretations and when reasonably possible, the interpretations should favor the insured. But the reasonable interpretations must be consistent with the design of such provisions which is to protect the insurer from fraudulent and excessive claims. The purpose of such provisions or clauses is to protect the insurer from paying losses in excess of those actually sustained, the evident intent being to enable the insurer, by means of accurate records, to ascertain with reasonable certainty the amount of the loss and the extent of liability. In complying with such clauses no particular method or system of bookkeeping or record keeping is required, even the books or records may be informal; but there should be such substantial compliance as to enable the insurer to determine the loss with reasonable certainty. *Pruzan* v. *National Surety Corp.* (Mo. App.) 223 S.W.2d 8; *Goudie* v. *National Surety Co.* (Mo. App.) 288 S.W. 369; *Aronson* v. *Maryland Casualty Co.,* 222 Mo.App. 490 [280 S.W. 724]; *Aetna Casualty & Surety Co.* v. *Reliable Auto Tire Co., supra,* 58 F.2d 100; *Noland* v. *Buffalo Ins. Co., supra,* 181 F.2d 735; *American Mutual Liability Ins. Co.* v. *Thomas & Howard Co.* (4 Cir.) 228 F.2d 550; *American Mutual Liability Ins. Co.* v. *Thomas & Howard Co.* (4 Cir.) 223 F.2d 215 (in these two cases last cited the policy provisions were substantially as here—'The insured shall keep verifiable records of all property covered by this policy'); 29 Am. Jur., Insurance, § 720, p. 557; 45 C. J. S. Insurance § 658, pp. 574-582; 5 Couch on Insurance, Sections 1032-1032a, pp. 3592-3604."

As has been noted, the plaintiff received a written inventory of the personal property when it dealt with the Stevens brothers in the latter part of 1956. The evidence was sufficient to support an inference that that document was diverted by the

Stevens brothers to their own use when it was entrusted to one of them in the early part of 1957. But, while it has been held that the theft of records of the nature required to be kept under a policy of insurance will excuse a noncompliance with the requirement if the theft is due to no fault of the insured (see 29A. Am. Jur., Insurance, § 941), the difficulty in the present case is that records of the proper kind were not maintained at all. An examination of the inventory (as evidenced by the copy thereof produced by Mr. Corbin) shows that it does not disclose any item which can reasonably be said to be identical with an item found by the trial court to have been the subject of theft by the employees. It affords no aid with respect to the determination of the loss. (*Cf. Calloyan* v. *American Casualty Co. of Reading, Pa.* (D. C. Mun. App.) 51 A.2d 678; *Georgian House of Interiors* v. *Glens Falls Ins. Co.,* 21 Wn.2d 470 [151 P.2d 598, 612].) ▮▮▮ The applicable law as to the sufficiency of such records is that they "must themselves furnish the information required by the policy with reasonable certainty, unaided by oral testimony, except to explain the method of keeping them." (Note, 39 A.L.R. 1443, at p. 1457; see Note, 62 A.L.R. 630, 636; Note, 125 A.L.R. 350, 358; *New York Underwriters' Fire Ins. Co.* v. *Malham & Co.,* 25 F.2d 415, 421.) As stated in the *Calloyan* case (51 A.2d 678, at p. 680): "But such records are not sufficient if from them the loss cannot be determined without resorting to extraneous sources, especially the oral testimony of an interested party." The inventory disclosed by the evidence in the present case clearly fails to meet the test established by the applicable law. Without the aid of oral testimony it cannot be correlated with the plaintiff's claim as embodied in the documents submitted by it to the defendant in proof of its loss.

▮▮▮ The materiality of the provision as to verifiable records is clear. While such a requirement may be of more importance where the loss claimed is with respect to property which is of a fluctuating nature, such as an inventory of merchandise held for resale (*cf. American Mutual Liability Ins. Co.* v. *Thomas & Howard Co.,* 233 F.2d 215), it is obvious that in a case like that presently before the court such a provision serves the very material purpose of enabling the insurer, "by means of accurate records, to ascertain with reasonable certainty the amount of the loss and the extent of liability." (*Miller* v. *American Bonding Co. of Baltimore, supra,* (Mo.)

319 S.W.2d 530, at p. 534.) It thus is directed to the avoidance of fraudulent or exaggerated claims. (See *Calloyan* v. *American Casualty Co. of Reading, Pa., supra,* (D. C. Mun. App.) 51 A.2d 678, 679; *Georgian House of Interiors* v. *Glens Falls Ins. Co.,* 21 Wn.2d 470 [151 P.2d 598, 610].) Moreover, the language of the policy is that "verifiable records of *all* property covered by this Policy" (emphasis added) shall be kept. Hence there is no basis for an interpretation to the effect that the requirement of such records is not applicable to property of the type herein involved. The court is not free to rewrite the contract or to indulge in any forced construction of its language. (See *Jensen* v. *Traders & General Ins. Co.,* 52 Cal.2d 786, 790-791 [345 P.2d 1].) Since the plaintiff did not keep verifiable records of *all* property covered by the policy,[2] the judgment must be reversed. (See *American Mutual Liability Ins. Co.* v. *Thomas & Howard Co., supra,* 233 F.2d 215, 220; *cf. Sirhan* v. *Liberty Mut. Ins. Co.,* 362 Pa. 195 [66 A.2d 831, 832].)

In view of the conclusion reached herein, it is not necessary to discuss other contentions of the defendant.

Reversed.

Shinn, P. J., concurred.

A petition for a rehearing was denied February 21, 1962, and respondent's petition for a hearing by the Supreme Court was denied March 21, 1962.

---

[2]In the course of the argument in its brief the plaintiff concedes that no other record, other than the inventory, existed. Such concession is expressed as follows: "The inventory had been obtained only a short time before the loss occurred, and accordingly the items thereon had not been listed or entered in any of plaintiff's other records or books." It is to be noted, in passing, that the inventory was obtained late in 1956 while the loss occurred about the early part of July 1957.