950 P.2d 479 (1997)
Keith PILGRIM and Renae Pilgrim, husband and wife, and the marital community composed thereof, Appellants,
v.
STATE FARM FIRE & CASUALTY INSURANCE COMPANY, foreign insurance corporation; and Gailann Stargardter and John Doe Stargardter, husband and wife, and the marital community composed thereof, Respondents.
No. 38549-6-I.
Court of Appeals of Washington, Division 1.
September 22, 1997.
Publication Ordered December 18, 1997.
*480 Robert G. Nylander, Cutler & Nylander PS, Seattle, for Appellants.
W. George Bassett, Graham & Dunn, Seattle, for Respondents.
WEBSTER, Judge.
This case concerns the cooperation clause in an insurance contract and the legislature's recent efforts to diminish fraud in the making of insurance claims. Here, the Pilgrims, who were in the process of selling their home, reported a theft of approximately $15,000 in personal property from their home to the police; the investigating officer found no evidence of forced entry. When filing an itemized claim with State Farm Insurance, the Pilgrims claimed approximately $148,000 in stolen personal property. When analyzing the claim, State Farm questioned whether the Pilgrims had sufficient income to purchase the property that they claimed had been stolen. It demanded personal financial information necessary to prove or disprove its suspicion that the claim was fraudulent. Although the insurance policy required the Pilgrims to provide State Farm with records and documents as requested, the Pilgrims refused to turn over their tax returns and financial documents relating to their businesses. State Farm denied coverage for breach of the cooperation clause, and the Pilgrims sued. The trial court held that the Pilgrims' refusal to cooperate excluded coverage, and we affirm.

I.

FACTS
In fall 1993, Keith and Renae Pilgrim wanted to sell their King County house and move to eastern Washington. During the time the house was on the market, the Pilgrims returned home after dinner with friends one October evening to find that their home had been burglarized.[1] A King County police officer investigated, and determined that force had not been used to get inside the home.[2] The officer reported that "everything was left neat, except the jewelry box on the bed."[3] The Pilgrims made a preliminary list of missing property, assigning value to most of the listed items; they alleged that approximately $15,000 worth of items had been stolen.[4] They also immediately notified State Farm Insurance, with whom they had homeowner's insurance that included defined peril personal property coverage. Keith Pilgrim gave State Farm a statement.[5] The Pilgrims began working to uncover and document *481 the extent of their loss.[6]
The police officer called Keith a month later. Because the theft did not involve forced entry, the Pilgrims were selling their house, and the officer believed that they were having financial difficulties and had submitted a high claim, he told Keith that it "made him wonder."[7] When he directly asked if Keith had filed a false claim, Keith answered negatively.[8] The record contains no support for the officer's assertion that the Pilgrims were having financial difficulties.
Keith Pilgrim sent State Farm two signed inventory forms describing the stolen property, its replacement cost, and its actual cash value. The replacement cost on those December 1993 and January 1994 forms totaled $70,372.94 and $78,083.18 respectively.[9] The personal property limit under the Pilgrim's policy was $127,800, and State Farm advanced the Pilgrims $15,000 on their claim.[10]
The following April, without being under oath, and accompanied by their attorney, Keith and Renae answered the claim specialist's questions. State Farm requested authorization to obtain credit reports; the record contains no response.[11] When scheduling examinations under oath, State Farm requested, in addition to several other types of documents, personal income tax returns (1990-93), documents relating to their personal financial condition in the twelve months preceding the loss, documents relating to the financial condition of businesses in which they had an ownership interest at the time of the loss, and any financial statements prepared over the past four years.[12] State Farm subsequently told the Pilgrims that the information related to their financial status, their ability to have acquired the items claimed as stolen, and "any possible motive for falsifying or overvaluing their claimed losses."[13] The Pilgrims refused to produce the documents unless State Farm executed a confidentiality agreement.[14] That agreement would have prohibited State Farm from divulging, to third parties including the police, information received from the Pilgrims.[15]
Later, in fall 1994, the Pilgrims informed State Farm that many types of documents that it sought were not "known to exist." For example, the Pilgrims were not involved in any litigation that had settled during the year preceding the loss.[16] As to the financial documents that State Farm requested, the Pilgrims produced their W-2 forms for 1990-1993, but refused to produce anything else in light of State Farm's refusal to sign the confidentiality agreement.[17] Eventually, State Farm canceled the examinations under oath.[18]
The Pilgrims filed this action against State Farm in early October 1994, seeking a coverage declaration, attorney fees, and damages pursuant to the Consumer Protection Act. Before they served the complaint, State Farm denied the Pilgrims theft claim. After receiving the complaint, State Farm counterclaimed for restitution of the $15,000.[19]
State Farm moved for summary judgment, contending that the Pilgrims breach of the policy's cooperation and concealment clauses compelled dismissal.[20] It relied entirely on its own attorney's affidavit authenticating documents. The documents laid out the reasons that State Farm suspected fraud, and the Pilgrims' failure to cooperate:
 An investigating police officer told Keith that the circumstances "made him wonder" *482 and asked Keith if he had filed a false report.
 The Pilgrims refused to authorize third parties to give State Farm documents. On the other hand, because the record contains only a credit bureau authorization, we do not know whether State Farm sought other records.
 The discrepancy between the initial valuation of stolen items to police ($14,760) and the itemized claim to State Farm ($148,000).
 The Pilgrims refused to produce personal income tax returns (1990-93), documents relating to their personal financial condition in the twelve months preceding the loss, documents relating to the financial condition of businesses in which they had an ownership interest at the time of the loss, and financial statements (2/15/89  05/94), and produced only their W-2's for 1990-93. The W-2's demonstrated that the Pilgrims had a joint annual gross income ranging from $57,500 to $61,500 in 1991-93.[21]
In response, Keith Pilgrim detailed his dealings with State Farm, accused it of rude, adversarial behavior, and denied that he and his wife had any financial problems.[22] In a later declaration, he explained his unwillingness to release documents as reflecting his participation in the sensitive, challenging start-up of two new businesses: "Both of the new businesses involved marketing products and I could not afford to have an individual as callous and reckless with his statements as Mr. Lee (State Farm's claim specialist) evidenced, having my wife's and my private and personal and business financial information spread around in public, let alone in an unfavorable if not defamatory manner."[23]
In reply, the State Farm claim specialist who had performed the majority of work on the Pilgrims' claim alleged that (1) when the Pilgrims moved, they refused to give him their new eastern Washington address, (2) having analyzed the claim, nearly $30,000 of the items allegedly stolen were purchased in the 12 months preceding the claim, and (3) State Farm had paid Keith Pilgrim $17,549 for a theft loss in 1988. That loss shared a similarity with the Pilgrims' fall 1993 loss: in both cases, Keith reported that the thieves had stacked a TV and some stereo equipment near the door.[24] The claim specialist also submitted Pilgrim's letter asking the police to withhold the 1988 theft police report from requesters. The police, after notifying Pilgrim, disclosed the report to State Farm under the Public Records Act.[25] Considering this evidence, the claim specialist stated that he "had concerns about whether the loss had actually occurred, whether Mr. Pilgrim had financial difficulties, ... whether he had sufficient discretionary income to afford the items claimed to have been stolen and whether he had overstated the amount of the loss."[26]
Keith Pilgrim denied many of the claim specialist's allegations. He had given the specialist his eastern Washington work address. He labeled the alleged attempt to prevent disclosure of the police report as "false." He explained that the items left by the door were old and in poor working condition.[27] And he attacked the specialist's conclusion that $30,000 of the allegedly stolen property had been purchased in the 12 months preceding the claim. We have independently analyzed the inventory forms. Using the Pilgrims' replacement cost figures, they purchased approximately $18,500 worth of personal property in the twelve months preceding the loss. Between January 1, 1992 through October 11, 1992, a 20 month period, they purchased personal property worth approximately $39,000.[28]
The trial court granted State Farm's motion for summary judgment. To bifurcate the cooperation and concealment clause issues *483 from the restitution counterclaim, it also certified its judgment under CR 54(b).

II.

DISCUSSION

A.

Insured's Obligation Under Cooperation Clause
The Pilgrims' homeowner's insurance policy requires that they cooperate with State Farm by providing it with requested records and documents as often as it reasonably requires.[29] Such clauses are generally enforceable.[30] They deter fraud, and facilitate proper adjusting decisions by insurers.[31] Not only have such clauses long been included in insurance policies, the Washington State legislature also recently required insurers to do more to root out fraud.[32] Yet, the insurer can only require an insured to provide answers to material requests, that is, matters concerning a subject reasonably relevant and germane to the insurer's investigation as it was proceeding at the time it made the demand.[33] Put another way, an insured does not need to supply information unrelated to the policy or investigation of the claim.[34] The standard by which the insured's conduct is measured is substantial compliance.[35] The cooperation clause has been characterized as either a condition precedent or a covenant of the contract.[36] In either case, the insurer has the burden of establishing the absence of cooperation.[37] In this sense, it is an affirmative defense.

B.

Reasonableness and Relevance of State Farm's Requests
During the process of compiling and evaluating the Pilgrims' claim, State Farm became aware of facts justifying a detailed investigation. These facts included the enormous discrepancy between the amount of the claim given to police and the subsequent claim filed with State Farm, the absence of forced entry, and the existence of a prior claim with one identical fact. Furthermore, based on the record, the Pilgrims were alleging that they had purchased over $18,500 in personal property between October 1992 and October 1993, a year during which their combined net income approximated $56,000 and during which their annual mortgage and car payments totaled $24,000.[38] State Farm was justified in seeking financial records that would establish or disprove motive, as well as the Pilgrims' ability to acquire the amount of personal property that they claimed had been stolen. It sought personal income tax returns (1990-93), documents relating to their personal financial condition in the twelve months preceding the loss, documents relating to the financial condition of businesses in which they had an ownership interest at the time of the loss, and financial statements (2/15/89  05/94).[39]
1. Income Tax Returns, documents relating to their personal financial condition in the twelve months preceding the loss, and financial statements
An insured's income and financial condition are undoubtedly relevant to an investigation *484 of whether they filed a fraudulent claim.[40] Here, State Farm received W-2 forms demonstrating the Pilgrims' income over a four year period, including the year of the alleged theft. With these records, it could make a reasoned determination as to whether that net income would allow purchases of the amounts claimed during the years preceding the loss. Still, the Pilgrims refused to allow State Farm to obtain credit reports, and declined to present their own documents establishing their general financial condition.
2. Documents relating to the financial condition of businesses in which they had an ownership interest at the time of the loss
The relevant inquiry is whether the Pilgrims had financial obligations that they were unable to meet. At a minimum, the Pilgrims should have produced documentation establishing their obligations to the entrepreneurial enterprises in which they were participating, as well as financial information showing business assets and liabilities.
3. Effect of the Proposed Confidentiality Agreement
The Pilgrims argue that they would have produced financial documentation if State Farm signed their proposed confidentiality agreement. But the proposed confidentiality agreement precluded the insurer from releasing information to any third party, including the police. This aspect of the agreement violates State Farm's statutory obligations to report fraud.[41] As a result, State Farm reasonably refused to sign it. We express no opinion as to the parties' other arguments regarding the appropriateness of an insured's demand for a confidentiality agreement.

C.

Absence Of Cooperation As A Matter of Law
The Pilgrims promised to cooperate with State Farm's investigation by producing "records and documents" as often as State Farm "reasonably require[s]". The issue is whether, as a matter of law, they breached their promise. No evidence is disputed. That evidence demonstrates that the Pilgrims at least partially complied with the cooperation duty. For example, during Keith's and Renae's interviews, both answered questions about financial accounts they maintained, to whom and how much money they owed, the status of their taxes, the absence of judgments, liens, and outstanding credit card balances.[42] Nevertheless, no reasonable juror could conclude that the Pilgrims substantially cooperated in the production of relevant, reasonable, requested financial documents. With the exception of their W-2's, they produced nothing. And they refused to authorize third parties to disclose relevant financial information to State Farm. Their substantial failure to cooperate constitutes a breach of the cooperation clause as a matter of law.[43]

D.

Prejudice
Among the fifty states, "[a] wide divergence of opinion exists as to whether prejudice is necessary in order to enable an *485 insurer to avoid liability where there is some failure to co-operate by the insured."[44] In Washington, however, the rule is well established. In every cooperation clause, notice clause, and "no settlement clause" case, where the prejudice issue has been raised, the court has analyzed prejudice. Three courts have discussed prejudice when addressing cooperation clauses.[45] Numerous courts have analyzed prejudice when addressing notice clauses.[46] One case analyzed prejudice in the context of a no settlement clause.[47] These types of clauses are similar in that they all condition payment of the claim on the insured's satisfaction of policy requirements. They are designed "to prevent the insurer from being prejudiced by the insured's actions."[48] Therefore, "[t]o release an insurer from its obligations without a showing of actual prejudice would be to authorize a possible windfall for the insurers."[49] By contrast, courts refuse to analyze prejudice in cases involving types of clauses other than those involving the handling of claims.[50]
State Farm contends that the prejudice requirement should only apply to claims in which innocent third parties could be damaged. But Washington courts have not limited the application of the doctrine to such cases. It may be a peculiarity of insurance law, or a variant of general contract law, but not every breach discharges performance by the other party.[51] Whatever the reason, the purpose of cooperation clauses is to "prevent the insurer from being prejudiced by the insured's actions."[52] As a result, absent prejudice, an insurer is not discharged from the obligation to pay on a valid claim.
To establish prejudice, the insurer must show "concrete detriment ... together with some specific harm to the insurer caused thereby."[53] Moreover, the issue of prejudice from a policy breach is a question of fact for the jury and "will be presumed only in extreme cases."[54] Thus, in PUD 1, *486 our Supreme Court upheld the denial of summary judgment on the issue of prejudice even though the insureds had settled without the insurer's consent, resulting in a payment under the policy.[55] On the other hand, in Felice v. St. Paul Fire & Marine Ins. Co.,[56] the insurer was actually prejudiced by its inability to investigate and evaluate the case or prepare a defense because the issue of Felice's liability had been litigated before the insurer received notice.[57]
State Farm argues that it was prejudiced by its inability to complete its investigation of the facts underlying the Pilgrims' claim and the risk of litigation if it denied the claim. We agree. Without access to financial documents, State Farm could not evaluate the validity of the Pilgrims' claim. It could not decide whether the claim was covered, much less prepare a defense to the inevitable suit by the Pilgrims if it denied coverage. It could not satisfy its statutory duty to ferret out fraud. The Pilgrims' refusal to disclose relevant financial information prejudiced State Farm as a matter of law.
Given our disposition, we need not address the policy's concealment clause.
We affirm the judgment.
BAKER and AGID, JJ., concur.

Appendix

SECTION I, CONDITIONS
2. Your Duties After Loss. After a loss to which this insurance may apply, you shall see that the following duties are performed:
....
c. prepare an inventory of damages or stolen personal property. Show in detail the quantity, description, actual cash value and amount of loss. Attach to the inventory all bills, receipts and related documents that substantiate the figures in the inventory;
d. as often as we reasonably require:
(1) exhibit the damages property;
(2) provide us with records and documents we request and permit us to make copies;
(3) submit to and subscribe, while not in the presence of any other insured:
(a) statements; and
(b) examinations under oath; and

SECTION I AND SECTION IICONDITIONS
2. Concealment or Fraud. This policy is void as to you and any other insured, if you or any other insured under this policy has intentionally concealed or misrepresented any material fact or circumstances relating to this insurance whether before or after a loss.
NOTES
[1] CP 618.
[2] CP 289.
[3] CP 291.
[4] CP 290.
[5] CP 623.
[6] CP 619.
[7] CP 293.
[8] CP 293.
[9] CP 296-304, 306-316.
[10] CP 8, 318-19.
[11] CP 343.
[12] CP 348.
[13] CP 370.
[14] CP 361.
[15] CP 362.
[16] CP 377.
[17] CP 377.
[18] CP 432.
[19] CP 614.
[20] An appendix contains policy provisions.
[21] CP 461-65.
[22] CP 623.
[23] CP 594.
[24] RP 541.
[25] CP 556.
[26] CP 542.
[27] CP 592-94.
[28] CP 296-316.
[29] Section I(2)(d)(2). See appendix.
[30] Burr v. Lane, 10 Wash.App. 661, 669, 517 P.2d 988 (1974); George J. Couch et. al, 14 Cyclopedia of Insurance Law § 51:106 (2d ed.1982); Georgian House of Interiors v. Glens Falls Ins. Co., 21 Wash.2d 470, 494, 151 P.2d 598 (1944).
[31] Georgian House, 21 Wash.2d 470, 494, 151 P.2d 598.
[32] RCW 48.30A.045-.050; Gabor v. State Farm Mutual Automobile Ins. Co., 66 Ohio App.3d 141, 583 N.E.2d 1041, 1043 (Ohio Ct.App.1990).
[33] Fine v. Bellefonte Underwriters Ins. Co., 725 F.2d 179, 183 (2d Cir.1984).
[34] John Alan Appleman and Jean Appleman, 5A Insurance Law and Practice § 3552 (1970).
[35] Shaw v. Standard Fire Ins. Co., 129 Wash. 576, 578-79, 225 P. 651 (1924); Georgian House, 21 Wash.2d 470, 483, 151 P.2d 598.
[36] Oregon Auto. Ins. Co. v. Salzberg, 85 Wash.2d 372, 376, 535 P.2d 816 (1975).
[37] Salzberg, 85 Wash.2d 372, 377, 535 P.2d 816.
[38] CP 296-316, 1247, 1205.
[39] CP 348.
[40] Wood v. Allstate Ins. Co., 21 F.3d 741, 747 (7th Cir.1994); DiFrancisco v. Chubb Ins. Co., 283 N.J.Super. 601, 662 A.2d 1027, 1031 (1995).
[41] RCW 48.30A.050(3), 48.30A.065.
[42] CP 1206-07.
[43] Compare Gabor v. State Farm Mut. Auto. Ins., 66 Ohio App.3d 141, 583 N.E.2d 1041, 1044 (failure to produce income tax records was substantial breach of cooperation clause as a matter of law); and Powell v. United States Fidelity and Guaranty Co., 855 F.Supp. 858, 861 (E.D.Va. 1994) (refusal to provide a substantial amount of requested information related to financial condition breached cooperation clause as a matter of law); with Templin v. Grange Mutual Casualty Co., 81 Ohio App.3d 572, 611 N.E.2d 944, 947-48 (Ohio Ct.App.1992) (partial cooperation and inability to produce some information destroyed by fire raised issue of material fact as to breach of cooperation clause), and Wood, 21 F.3d 741, 747 (because insured signed general authorization allowing insurer access to financial records, summary judgment inappropriate on insurer's defense that insured breached cooperation clause).
[44] George J. Couch et al, 14 Cyclopedia of Insurance Law § 51:107 (2d ed.1982).
[45] Salzberg, 85 Wash.2d 372, 377, 535 P.2d 816; Tibbs v. Johnson, 30 Wash.App. 107, 110, 632 P.2d 904 (1981) (stating applicability of prejudice rule, but disposing of case by applying financial responsibility law); and Washington Ins. Guaranty Ass'n v. Hill, 19 Wash.App. 195, 196, 574 P.2d 405 (1978) (plaintiff failed to file statement under oath within thirty days) (this case could be characterized as a notice case).
[46] Pederson's Fryer Farms, Inc. v. Transamerica Ins. Co., 83 Wash.App. 432, 439, 922 P.2d 126 (1996) (no prejudice as a matter of law in case where insured failed to notify insurer in accordance with the policy); Canron, Inc. v. Federal Ins. Co., 82 Wash.App. 480, 485, 918 P.2d 937 (1996) ("Noncompliance with a policy provision does not deprive the insured of the benefits of the policy unless the insurer demonstrates actual prejudice resulting from the insured's noncompliance."); Felice v. St. Paul Fire and Marine Ins. Co., 42 Wash.App. 352, 358, 711 P.2d 1066 (1985) (insurer prejudiced as a matter of law); Pulse v. Northwest Farm Bureau Ins. Co., 18 Wash.App. 59, 61, 566 P.2d 577 (1977); Spangler v. Insurance Co. of North America, 17 Wash.App. 121, 128, 562 P.2d 635 (1977). See also Olds-Olympic, Inc. v. Commercial Union Ins. Co., 129 Wash.2d 464, 480 n. 1, 918 P.2d 923 (1996) (no late notice, but court noted applicability of prejudice standard had notice been untimely).
[47] Public Utility Dist. No. 1 of Klickitat County v. International Ins. Co., 124 Wash.2d 789, 803, 881 P.2d 1020 (1994).
[48] Public Utility Dist. No. 1, 124 Wash.2d at 803, 881 P.2d 1020.
[49] Public Utility Dist. No. 1, 124 Wash.2d at 803, 881 P.2d 1020.
[50] Safeco Title Ins. Co. v. Gannon, 54 Wash.App. 330, 774 P.2d 30 (1989) (refusing to apply prejudice analysis to a termination of coverage clause in a claims made policy); and Simms v. Allstate Ins. Co., 27 Wash.App. 872, 876-77, 621 P.2d 155 (1980) (finding of prejudice not required when insured relies on statute of limitations clause because it is "simply a contractual modification of the statute of limitations."); Mutual of Enumclaw Ins. Co. v. Cox, 110 Wash.2d 643, 757 P.2d 499 (1988) ("This entire policy is void if ... there has been fraud or false swearing").
[51] Arthur L. Corbin, 6 Corbin on Contracts § 1253 (1962).
[52] PUD 1, 124 Wash.2d at 803, 881 P.2d 1020.
[53] Canron, Inc. v. Federal Ins. Co., 82 Wash.App. 480, 487, 918 P.2d 937 (1996).
[54] Pulse v. Northwest Farm Bureau Ins. Co., 18 Wash.App. 59, 62, 566 P.2d 577 (1977). Accord PUD 1, 124 Wash.2d at 805, 881 P.2d 1020; Twin City Fire Ins. Co. v. King County, 749 F.Supp. 230, 233 (W.D.Wash.1990) (applying Washington law).
[55] PUD 1, 124 Wash.2d at 805, 881 P.2d 1020; see also Canron, 82 Wash.App. at 491-92, 918 P.2d 937.
[56] 42 Wash.App. 352, 711 P.2d 1066 (1985).
[57] Felice, 42 Wash.App. at 360, 711 P.2d 1066.