[No. 21713-9-II.    Division Two.    September 25, 1998.]

KEVIN ALBEE, ET AL., *Appellants*, v. FARMERS INSURANCE COMPANY, *Respondent*.

*William D. Robison* and *Ben Shafton* of *Morse & Bratt*, for appellants.

*Wade R. Keenon* and *Terry M. Weiner* of *Mitchell Lang & Smith* (*Thomas Christ*, of counsel), for respondent.

MORGAN, J. — Farmers Insurance Company suspended the payment of Personal Injury Protection (PIP) benefits

after Kevin Albee failed to attend two medical examinations that it had scheduled. Albee sued for bad faith, but the trial court dismissed on summary judgment. We affirm.

On April 20, 1996, Kevin Albee[1] was injured in a two-vehicle accident. At that time, he was employed by a convalescent center as a certified nurse's aide.

Both Albee and the other driver were insured by Farmers Insurance Company of Washington. Albee's policy included Personal Injury Protection. It also included a clause, hereafter called the cooperation clause, providing:

> A person claiming any coverage of this policy must also:
>
> 1. Cooperate with us and assist us in any matter concerning a claim or suit.
>
> . . . .
>
> 3. Submit to physical examinations at our expense by doctors we select as often as we may reasonably require.[2]

On April 20, the same day as the accident, Albee went to a hospital emergency room. The attending staff member diagnosed a back or neck injury. He or she also recommended that Albee apply ice to the injured area for 48-72 hours; that Albee "follow up if worse or not improving in 3-4 days"; and that Albee not return for "at least 2 days" to his job as a certified nurse's aide in a local convalescent center.[3]

On April 22, Albee saw Dr. Douglas Keith, who prescribed a cervical collar. On April 29, Albee again saw Dr. Keith, who advised that Albee should remain off work for another week.

On or about April 30, Albee applied to Farmers for PIP benefits. Between then and June 5, Farmers paid $5,212.73

---

[1]Albee's wife Mary is also a party to the action. For convenience, we refer only to him.

[2]Clerk's Papers, at 39.

[3]Clerk's Papers, at 128.

in medical expenses, $2,160 in lost wages, and $600 for loss of services.

On May 6, Dr. Keith filled out and returned a form sent by Farmers. After stating that Albee had suffered a whiplash injury due to the accident, Dr. Keith indicated that Albee had been unable to work since the accident; that he would be unable to work for another "3-4 [weeks]"; and that he was expected to remain in treatment for about that same period of time.[4]

On June 3, Albee again saw Dr. Keith. Dr. Keith noted in the chart that Albee was continuing to experience "mid-thoracic back pain," and that "he says he has not changed that much."[5] Then Dr. Keith went on:

He is going to be seeing a neurosurgeon just to see if an MRI is needed and go from there. I am concerned with Mr. Albee that there is quite a bit of secondary game [sic] going on here. He has not gone to work at all. He continues to complain of pain although he looks fairly good to me. He has also been having people mow the lawn, etc. for him, so I wonder if there are other issues going on here.[6]

On June 7, Albee saw Dr. Gambee, a neurosurgeon to whom Dr. Keith had referred him. Dr. Gambee supplied some painkillers and information on range of motion exercises. Dr. Gambee said in his report, "I think he should go back to work."[7]

On June 10, Albee saw Dr. Keith again, and Dr. Keith noted in his chart:

Kevin Albee comes back for followup of his whiplash injury. He saw Dr. Gambee last week and was very dissatisfied with his service. He felt he was very rude and did not listen to his complaints. He told him that he could be released for work immediately. His neck was apparently injected which he says has

---

[4]Clerk's Papers, at 131.

[5]Clerk's Papers, at 140.

[6]Clerk's Papers, at 140.

[7]Clerk's Papers, at 136.

made his headache worse. He still has left hand numbness which has not improved. He denies any weakness. At this point, it is becoming very difficult to know with Mr. Albee what is truly objective and what is subjectively continuing to get worse. Certainly there is an element of secondary gain with the insurance claims. In any event, my feeling is that we need to go ahead with an MRI. We certainly need to see if there is evidence of a C8 nerve root compression to substantiate some of his symptomatic problems. . . . If the MRI is negative, it is my feeling that we are going to have to try to push him forward to get him back and be more active. But, I am going to wait to get some more objective data before we do this.[8]

Also on June 10, Dr. Keith filled out and returned another form sent by Farmers. He stated that Albee was still unable to work, and that he should return to work when he was able to lift more than 40 pounds "[without] injury or worsening of pain."[9]

On June 10, Farmers received Dr. Keith's June 10 report, although it still did not have the chart notes quoted above. The same day, Farmers wrote Albee a letter in which it stated:

Your file has been reviewed in regards to your Personal Injury Protection Benefits. To properly evaluate your medical condition and anticipated future treatment plan we wish to seek a second opinion from a physician of our choice.[10]

The letter went on to quote the policy's cooperation clause and to state that Albee should appear for examination by Dr. Hubbard on June 28, 1996. Apparently, Dr. Hubbard was associated with a firm called Cor-Care.

On June 21, counsel for Albee wrote back to Farmers. He indicated that Albee would not be attending the scheduled exam and requested nine categories of information, including "[1] a certified copy of the policy; [2] Dr. Hubbard's

[8]Clerk's Papers, at 139.

[9]Clerk's Papers, at 134.

[10]Clerk's Papers, at 50.

resume; [3] documents showing a practice of contracting with Cor-Care to conduct exams on behalf of Farmers; [4] a detailed statement of each reason why [Farmers] felt an exam was necessary; [5] an indication of whether [Farmers] was contesting Mr. Albee's entitlement to any personal injury protection benefits; [6] an itemization of the questions [Farmers] wished to propose to the doctors; [7] manuals or other writings used by Farmers to show when an exam should be requested; . . . [8] a copy of the entire personal injury protection file[; and (9) whether] . . . the exam could be recorded."[11] Counsel further stated:

> Mr. Albee and I must evaluate the reasonableness of your request to have him undergo an exam at this time and the nature and extent of what you are attempting to accomplish. The exam can be rescheduled if an appropriate response is given.[12]

On June 26 or 27, Farmers called the assistant to Albee's counsel. It said it would supply a certified copy of the policy and a copy of its PIP file, but not the remainder of the information requested. It also said it would be rescheduling the disputed medical exam.

On July 8, Farmers received a copy of the chart notes quoted above. On July 10, it again wrote Albee's counsel, indicating that it had scheduled an exam with Dr. Duff for July 18, 1996, and that if Albee did not attend, "all benefits will be suspended as of the appointment date until an exam is attended."[13]

On July 11, Albee's counsel wrote to say that Albee would not attend the newly scheduled exam. Counsel reiterated his demand for information and said he was particularly interested in items 4, 5, 6, 8, and 9.

On July 18, Farmers suspended payment of Albee's PIP benefits. On August 27, Albee sued Farmers, alleging bad

---

[11]Br. of Appellant, at 7-8.

[12]Clerk's Papers, at 52.

[13]Clerk's Papers, at 55.

faith and violation of the Consumer Protection Act. Through counsel, Farmers responded by letter that "it is our position that Farmers has an absolute right to at least one IME under the PIP portion to determine whether the treatment is 'reasonable and necessary' under the policy."[14]

On August 30, Farmers sent another letter saying it had scheduled yet another exam with Dr. Hubbard for September 13, 1996. On September 9, Albee reiterated his demand for information and indicated Albee would not attend. On September 11, Farmers stated by letter that it wanted to have Albee examined "to determine whether his treatment to date, and future treatment, is reasonable and necessary."[15] It also disclosed the inquiries it wanted the examining doctor to make. On September 13, Albee responded that Farmers' proposed inquiries were overbroad; that he would not attend the scheduled exam; and that he would be pursuing his lawsuit.

On December 30, 1996, Farmers made a motion for summary judgment of dismissal. On January 14, 1997, Albee made a cross-motion for an order establishing liability. In March, the trial court granted Farmers' motion and denied Albee's.

Albee now appeals. His principal claims are that the cooperation clause was unlawful; that even if it were not, Farmers was required to have, and did not have, a reasonable basis for demanding an exam; that even if a rational trier could find that Farmers had a reasonable basis, a rational trier could also find to the contrary, thus creating an issue of fact for trial; and that all else notwithstanding, Farmers could not suspend his PIP benefits without a demonstration of prejudice.

I.

The first issue is whether Farmers could lawfully include the cooperation clause in its policy. According to

[14]Clerk's Papers, at 23.

[15]Clerk's Papers, at 25.

the Supreme Court, "an insurer is permitted to limit its liability unless to do so would be inconsistent with public policy."[16] Applied here, this means that an insurer may condition its liability in any way consistent with public policy, whether or not authorized by statute.

Albee asserts that the cooperation clause is not authorized by RCW 48.22.085(1).[17] That is true, but that also is not enough to show a violation of public policy.

Albee further asserts that the cooperation clause "reduce[s] or eliminate[s]"[18] the coverage mandated by RCW 48.22.085(1). Farmers responds that the clause "does not prevent insureds who deserve PIP benefits from receiving them in full and on time. It simply ensures that those who receive PIP benefits deserve them."[19] We hold that the cooperation clause did not abridge the statutorily mandated coverage.

Albee asserts, in abbreviated fashion, that RCW 48.22.090[20] demonstrates a legislative intent to preclude cooperation clauses of the type in issue here. We do not perceive that from the face of the statute, and Albee does

---

[16]*Britton v. Safeco Ins. Co.*, 104 Wn.2d 518, 528-29, 707 P.2d 125 (1985). Accord, *American Home Assurance Co. v. Cohen*, 124 Wn.2d 865, 873, 881 P.2d 1001 (1994). *See also Huntt v. State Farm Mut. Auto Ins.*, 72 Md. App. 189, 192, 527 A.2d 1333, *cert. denied*, 311 Md. 286 (1987) (same type of clause as the one at issue here; insurer may enforce "a policy provision that is not in conflict with any statutory provision").

[17]Albee argues:

Personal injury protection benefits are now statutorily mandated. The legislation does not allow an insurer to condition payment of benefits on attendance at an examination by doctors of the insurer's choosing. Any provision in the insurer's policy placing such a requirement on the insured is therefore violative of public policy and cannot be enforced.

Br. of Appellant, at 12. RCW 48.22.085(1), effective July 1, 1994 provides:

(1) No new automobile liability insurance policy or renewal of such an existing policy may be issued unless personal injury protection coverage benefits at limits established in this chapter . . . are offered as an optional coverage.

[18]Appellant's Reply Br. at 2.

[19]Br. of Resp't, at 17.

[20]RCW 48.22.090(2) provides:

not suggest any other reason for so believing. Accordingly, we reject this argument and conclude that Farmers could lawfully include the cooperation clause in its policy.

## II.

The next issue is whether Farmers was required to have a reasonable basis before it could demand an exam. Assuming without holding that it needed such a basis, it had such a basis here. Albee allegedly suffered a soft tissue back injury. He was off work longer than originally anticipated. One treating doctor thought, on at least two occasions, that Albee might be concerned with "secondary gain." A second treating doctor thought, more bluntly, that Albee "should go back to work."[21] Given that Farmers was obligated to pay only wage loss and medical bills attributable to the accident, it had a reasonable basis for demanding an exam.

## III.

■ ■ The next issue is whether the record shows an is-

---

(2) Personal injury protection coverage need not be provided to or on behalf of:

(a) A person who intentionally causes injury to himself or herself;

(b) A person who is injured while participating in a prearranged or organized racing or speed contest or in practice or preparation for such a contest;

(c) A person whose bodily injury is due to war, whether or not declared, or to an act or condition incident to such circumstances;

(d) A person whose bodily injury results from the radioactive, toxic, explosive, or other hazardous properties of nuclear material;

(e) The named insured or a relative while occupying a motor vehicle owned by the named insured or furnished for the named insured's regular use, if such motor vehicle is not described on the declaration page of the policy under which a claim is made;

(f) A relative while occupying a motor vehicle owned by the relative or furnished for the relative's regular use, if such motor vehicle is not described on the declaration page of the policy under which a claim is made; or

(g) An insured whose bodily injury results or arises from the insured's use of an automobile in the commission of a felony.

[21]Farmers had all this information by the time of its second and third demands, even though it may not have had it all at the time of its first demand.

sue of fact requiring trial. Albee initially asserts that a rational trier of fact could find that Farmers lacked a reasonable basis for demanding an exam. Like the trial court, we hold to the contrary. Assuming that a reasonable basis was required, it existed so clearly that reasonable minds could not differ.

Albee further asserts that a rational trier of fact could find that Farmers was acting in bad faith when it suspended benefits. The assertion, however, is not supported by any evidence. Farmers had a reasonable basis for demanding an exam, it did so, and a rational trier could not find from the record presented here that the suspension was in bad faith.

We do not overlook Albee's assertion, or at least implication, that Farmers was seeking an exam in order to benefit the other driver in the accident, whom it also insured. Farmers counters that there is simply no evidence to support that, and it is correct. Moreover, we assume, without so holding, that Albee effectively could have required from Farmers, before submitting to the exam, a binding and enforceable commitment that Farmers' PIP-claims department would not disclose the results of the exam to its other insured or to its liability-claims department, except upon court order issued with notice to Albee.[22]

Nor do we overlook Albee's complaint that the exam results would have been legally discoverable, pursuant to Division Three's decision in *Johnson v. McCay*.[23] The remedy for that is to test *Johnson v. McCay*, a tack not taken here. If *Johnson v. McCay* properly states the law, it binds both insurer and insured when implemented by court order, and it does not provide a reason to refuse an exam otherwise required.

Finally, we do not overlook Albee's assertion that Farmers was hiring doctors that were too biased to properly carry out the purpose of the cooperation clause. The assertion pertains to Drs. Hubbard and Duff, and it is not sup-

[22]*Cf. Pilgrim v. State Farm Fire & Cas. Ins. Co.*, 89 Wn. App. 712, 722, 950 P.2d 479 (1997) (proposed confidentiality agreement was overbroad).

[23]77 Wn. App. 603, 893 P.2d 641 (1995).

ported by anything whatever that appears in the record.[24] We conclude that there are no issues of fact requiring trial.

## IV.

The last issue is whether Farmers, before it could lawfully suspend benefits, was required to demonstrate prejudice resulting from Albee's failure to submit to an exam. Assuming that it was, prejudice is shown here.[25] Farmers was trying to decide whether to pay PIP benefits, and in the absence of the exam it was hampered in its ability to make that decision, one way or the other.

Albee not having prevailed at trial or on appeal, he is not entitled to reasonable attorney's fees incurred in the trial court or this court.[26]

Affirmed.

BRIDGEWATER, A.C.J., and ARMSTRONG, J., concur.

After modification, further reconsideration denied November 6, 1998.

Review denied at 137 Wn.2d 1027 (1999).

---

[24]We are willing to assume that if the record did support the assertion, an appropriate remedy would exist, or at least could be devised. *Cf.* Joseph E. Edwards, Annotation, *Right of Defendant in Personal Injury Action to Conduct Medical Examination of Plaintiff*, 33 A.L.R.3D 1012 (1970). Here, however, we are not asked to consider the nature of such a remedy.

[25]*Tran v. State Farm Fire & Cas. Co.*, 136 Wn.2d 214, 217, 231-32, 961 P.2d 358 (1998); *Pilgrim*, 89 Wn. App. at 725.

[26]*Public Util. Dist. No. 1 v. International Ins. Co.*, 124 Wn.2d 789, 814-15, 881 P.2d 1020 (1994).