**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 03-2452

WAYNE L. SIMMS; TRACEY SIMMS,

Plaintiffs - Appellees,

versus

MUTUAL BENEFIT INSURANCE COMPANY,

Defendant - Appellant.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.   Alexander Harvey, II, Senior District
Judge.  (CA-02-1261-H)

Argued:  February 3, 2005              Decided:  June 30, 2005

Before WIDENER and KING, Circuit Judges, and Henry F. FLOYD, United
States District Judge for the District of South Carolina, sitting
by designation.

Affirmed by unpublished opinion.  Judge Floyd wrote the opinion, in
which Judge Widener and Judge King joined.

**ARGUED:** G. Stewart Webb, Jr., VENABLE, L.L.P., Baltimore, Maryland,
for Appellant.   Irwin Raphael Kramer, KRAMER & CONNOLLY, Owings
Mills, Maryland, for Appellees.  **ON BRIEF:** Randolph Stuart Sergent,
VENABLE, L.L.P., Baltimore, Maryland, for Appellant.  Lawrence S.
Greenberg, Baltimore, Maryland, for Appellees.

Unpublished opinions are not binding precedent in this circuit.
See Local Rule 36(c).

FLOYD, District Judge:

Mutual Benefit Insurance Company (MBIC) brings this appeal, asserting that the district court erred when it prevented MBIC from introducing evidence of Wayne and Tracey Simms' financial condition and charged the jury that MBIC must prove its affirmative defense by clear and convincing evidence.

We disagree and, for the reasons set forth below, affirm the district court.

## I.   FACTUAL AND PROCEDURAL HISTORY

During 1998 and 1999, Wayne and Tracey Simms built a new home on a tract of land located at 2624 Winters Run Road in Joppa, Maryland.  Tracey's father, Robert Spamer, owner of Spamer General Contracting, Inc., supervised the construction of the home. Tracey's sister, Bobbie Spamer, owned the parcel of land upon which the house was built.  Ownership of the land was transferred to the Simms by deed dated June 27, 2000.

In March of 1999, MBIC issued a homeowners' insurance policy, which insured the Simms' new home.  The policy contained, <u>inter alia</u>, limits of $434,000 for repair or replacement of the dwelling and $303,800 for repair or replacement of personal property.  An endorsement to the policy increased the coverage for the Simms' dwelling "to equal the current replacement cost of the dwelling," and increased the personal property coverage "by the same

percentage." (J.A. 872.) The policy was renewed annually. MBIC also issued a commercial insurance policy to the Simms with limits of $100,000.[1] Subject to the terms, conditions, and endorsements of the policies, the Simms were covered for, among other things, losses or damages sustained as a result of a fire.

On the afternoon of November 5, 2001, while Wayne and Tracey Simms were shopping, they received a phone message that their home had burned to the ground. They returned home to learn that their house and all of its contents had been completely destroyed.

After the Simms notified MBIC of the fire, the insurance company retained an arson investigator, Lee McAdams, to investigate the cause and origin of the fire. McAdams concluded that the cause of the fire was undetermined.

MBIC also retained Pat Bonnani, an independent claims adjuster, to process the Simms' claim. Bonanni met with the Simms to inform them of what they needed to do to submit their claim under the policies. Among other things, he explained to them the effect of depreciation on the replacement value of their property and the process for obtaining the actual cash value of their property should they decide not to replace it.

Soon after Bonanni's discussion with the Simms regarding the procedures for filing a claim, Tracey submitted 1) a personal

---

[1]Wayne Simms was self-employed and operated a trucking business known as RBS Trucking from his home.

3

property inventory, listing 1,689 destroyed items with a total replacement cost of $446,794.88; 2)invoices from Spamer General Contracting for demolition and debris removal performed at the home site, totaling $24,810; and 3) an estimate of the costs of rebuilding the home destroyed in the fire in the amount of $648,000. Tracey also informed Bonanni that the Simms planned to stay in a vacant, furnished house owned by her sister. Bonanni authorized the Simms to rent the dwelling for $1,700 per month. MBIC later determined that the dwelling occupied by the Simms was a loft apartment attached to a shed owned by Tracey's father.

The 69-page personal property inventory contained more than 1500 categories of items. The inventory set forth the date of purchase of each item lost in the fire, a description, the quantity, and the replacement cost, as determined by the Simms. The inventory revealed that the Simms claimed to have acquired roughly $146,000 worth of personal property in 1999, $60,000 - $65,000 worth of property in 2000, and $50,000 worth of property in 2001.

After reviewing the personal property inventory, and in light of his knowledge of the Simms' limited income, Bonanni became concerned with its magnitude and the amount of recent purchases. As a result of his concerns, Bonnani referred the case back to MBIC for further investigation.

William C. Parler, Jr., Esq., MBIC's attorney, scheduled Examinations Under Oath of both Tracey and Wayne for January 17, 2002. On the date of the examination, the Simms produced a revised personal property inventory and their 1999 and 2000 tax returns. Parler questioned Wayne and Tracey at length regarding discrepancies between the replacement costs listed by the Simms and the costs obtained by MBIC as a result of its own investigation. The examination continued on January 21, 2002, at which time Tracey submitted a second revised personal property inventory. This inventory provided a total replacement cost of $390,290.73.

Tracey was also questioned about the original and the replacement costs for the construction of the Simms' house. Tracey's father, Robert Spamer, supervised much of the construction of the original house, which cost $286,000. The cost estimate for the replacement of the house was $648,000, which was based upon a 5,500 square foot home at $120 per square foot. Tracey later informed her father, who had prepared the estimate, that the original house was only 4,900 square feet. Accordingly, Mr. Spamer reduced the replacement cost to $588,900.

An investigation of the Simms' financial data revealed that Wayne and Tracey were deeply in debt. Wayne's trucking business owed in excess of $150,000 in short and long-term debt, and the Simms owed $265,000 on their home mortgage. The Simms also owed $35,000 in credit card debt, $20,000 to the Internal Revenue

5

Service for past unpaid taxes, and the balance of a $60,000 lien to Bobbi Spamer for the land upon which the Simms' built their house. To service their total debt of $588,394, the Simms were required to make monthly payments of at least $8,250. The Simms had an approximate monthly, pre-tax income, both from Tracey's salary as a claims representative at State Farm and from the trucking business, of between $9,000 and $10,000.[2]

The insurance contract between the Simms and MBIC contains a provision that states that MBIC is not obligated to provide any coverage for property losses

> if, whether before or after a loss, one or more 'insureds' have:
>
> (1) Intentionally concealed or misrepresented any material fact or circumstance;
> (2) Engaged in fraudulent conduct; or
> (3) Made false statements;
>
> relating to this insurance.

(J.A. 867.)

On March 12, 2002, MBIC informed the Simms that their claim under their homeowner's policy had been denied. Counsel for MBIC informed the Simms that their policy would be considered void because of their misrepresentations and false statements made in support of their claim.

---

[2]The information regarding the Simms' financial condition is based primarily on the report of licensed certified public accountant Brad Ryden, whom MBIC sought to present as an expert on this issue. Ryden's report was not admitted into evidence and he was not allowed to testify at trial.

6

Thereafter, the Simms filed suit for breach of contract in state court against MBIC, seeking recovery of $1,500,000, plus interests and costs. MBIC later removed the case to the United States District Court for the District of Maryland.

In their complaint, the Simms alleged that MBIC's refusal to pay the demand set forth in their claim was a breach of the homeowners' and the commercial policy, and that the denial of the claim was not in good faith.

MBIC denied that it breached the contract between the parties and asserted that no coverage was available under the terms, conditions, and exclusions of the policies because the Simms intentionally concealed or misrepresented material facts or circumstances and/or engaged in fraudulent conduct relating to the insurance.

At trial, MBIC attempted to present to the jury evidence of the Simms' financial circumstances to argue that the Simms must have falsified their claim because they could not have purchased all of the property that they claimed, in the amounts that they claimed, within the few years that they claimed. MBIC also sought to introduce this evidence to demonstrate the Simms' motive for filing an inflated insurance claim.

Relying on Federal Rule of Evidence 403, the district court found that it would be prejudicial to the Simms if MBIC were to introduce evidence of the Simms' financial condition and refused to allow the financial information into evidence.

At the close of the trial, over MBIC's objection, the district court instructed the jury that Maryland law requires that an affirmative defense of fraud be established by clear and convincing evidence. The jury returned with a verdict of $1,023,147 in favor of the Simms. MBIC timely filed its appeal.

## II.  DISCUSSION

### A.  Exclusion of Evidence

Evidentiary rulings are generally reviewed for abuse of discretion. United States v. D'Anjou, 16 F.3d 604, 610 (4th Cir. 1994). However, MBIC asserts that this Court should review the district court's ruling in this case de novo because the ruling was based upon an error of law. See, e.g., H & W Indus., Inc. v. Occidental Chemical Corp., 911 F.2d 1118, 1121 (5th Cir. 1990) ("[W]here the admissibility determination necessarily involves a substantive legal decision, the court should review de novo the validity of the underlying legal analysis.").

We disagree. "Rule 403 judgments are preeminently the province of the trial courts." United States v. Love, 134 F.3d 595, 603 (4th Cir. 1998). Thus, we review such decisions with great deference, and will leave them undisturbed unless the court's "discretion has been plainly abused." Id. (citing United States v. Simpson, 910 F.2d 154, 157 (4th Cir. 1990)). "Such an abuse occurs only when it can be said that the trial court acted 'arbitrarily'

8

or 'irrationally' in admitting evidence." <u>Simpson</u>, 910 F.2d at 157 (citing <u>United States v. Masters</u>, 622 F.2d 83, 88 (4th Cir. 1980); <u>Garraghty v. Jordan</u>, 830 F.2d 1295, 1298 (4th Cir. 1987)).

The district court issued an oral order in which it granted the Simms' motion to exclude evidence of their financial condition. The court found that the probative value of the evidence MBIC sought to introduce was substantially outweighed by several factors. He first noted the danger for unfair prejudice. Included in the materials MBIC sought to introduce were the Simms tax returns. The district court ruled that admission of the tax returns could result in extreme prejudice if the jury concluded that the Simms failed to report all of their income. The court also stated that the Simms' financial condition was immaterial to whether they had a motive to inflate their claim.

Additionally, the trial court observed that introduction of the financial evidence could create serious confusion among the jurors about the relevant issues.

Finally, the court explained its concern that the introduction of such a voluminous amount of evidence would result in undue delay of the trial.

MBIC claims that the district court improperly excluded evidence of the Simms' financial condition, which, in turn, unfairly limited its defense. According to MBIC, because there was no direct evidence that the Simms made false statements, MBIC

9

intended to prove its affirmative defense with circumstantial evidence. The insurance company sought to use the financial statements at trial to elicit from the jury an inference that the Simms were financially incapable of acquiring all of the property they claimed to have lost in the fire and, thus, inflated their inventory either by including items they did not own, increasing the quantity of items beyond the number they actually owned, or declaring the items to be of a higher quality than they actually were.

In its brief, MBIC cites to various state law cases for the proposition that evidence of an insured's income level is relevant in determining whether the insured made a false claim. Phillips v. Allstate Indemnity Co., 156 Md. App 729, 745, 848 A.2d 681, 690 (2004); Pilgrim v. State Farm Fire & Cas. Ins. Co., 950 P.2d 479, 484 (Wash. App. 1997); Rymsha v. Trust Ins. Co., 746 N.E.2d 561, 564 (Mass. App. Ct. 2001); DiFrancisco v. Chubb Ins. Co., 662 A.2d 1027, 1033 (N.J. App. Div. 1995). These cases, however, are distinguishable from the case at hand. Each of the cases cited by MBIC deals with the insured's refusal to produce his or her financial records to the insurer as a part of the investigation of a claim, and whether such refusal was a breach of the contract for insurance, not whether such evidence was admissible for use at trial. Phillips, 156 Md. App. at 745, 848 A.2d at 690; Pilgrim, 950 P.2d at 484; Rymsha, 746 N.E.2d at 564; DiFrancisco, 662 A.2d

10

at 1033.  Nevertheless, even if the records were relevant to the case at hand,[3] Rule 403 provides for the exclusion of otherwise relevant evidence on the grounds of prejudice, confusion, or waste of time.  Fed. R. Evid. 403.  The district court's exclusion of the Simms' financial records was well within the bounds of Rule 403, and, thus, we find no error.

## B.  Burden of Proof

We review de novo MBIC's claim that the district court failed to provide the correct burden of proof in his instructions to the jury.  See Al-Abood v. El-Shamari, 217 F.3d 225, 235 (4th Cir. 2000).  At trial, the district court instructed the jury that MBIC had to prove its affirmative defense by clear and convincing evidence.  MBIC asserts that its affirmative defense was based upon the provisions of the insurance contract and not upon common law fraud, and, thus, preponderance of the evidence is the appropriate burden.  It further asserts that, by charging the clear and convincing burden of proof, the court ignored the two circumstances other than fraud under which the policy can be voided–the insured's 1) intentional concealment or misrepresentation of any material fact or circumstance, or 2) assertion of false statements.  We address each contention in turn.

---

[3]Judge Harvey describes the documents as "slightly relevant." (J.A. 637.)

11

## 1. Fraud

Maryland courts require that litigants establish a claim or defense of fraud by clear and convincing evidence. <u>Loyola Fed. Sav. & Loan Ass'n v. Trenchcraft, Inc.</u>, 17 Md. App. 646, 648, 303 A.2d 432, 434 (1973). However, MBIC argues, its defense of fraud is not properly equated with common law fraud because the insurance policy does not require MBIC to establish an intent to deceive or that it relied on the Simms' false statements to its detriment. <u>See</u> <u>Martens Chevrolet, Inc. v. Seney</u>, 292 Md. 328, 333, 439 A.2d 534, 537 (1982)(listing as three of the elements of common law fraud that 1) the misrepresentation was made for the purpose of defrauding some other person, 2) the plaintiff relied on the misrepresentation and had the right to rely on it, and 3) the plaintiff suffered compensable injury resulting from the misrepresentation).

MBIC is correct in its assertion that the insurance policy does not include the elements of common law fraud. Indeed, the policy is silent as to the steps MBIC must take to establish that the insurer has engaged in fraudulent conduct. Thus, we turn to common law to determine those steps. In Maryland, a party establishes fraud if it can show

> (1) that the representation made is false; (2) that its falsity was either known to the speaker, or the misrepresentation was made with such a reckless indifference to truth as to be equivalent to actual knowledge; (3) that it was made for the purpose of defrauding the person claiming to be injured thereby; (4)

12

that such person not only relied upon the misrepresentation, but had a right to rely upon it in the full belief of its truth, and that he would not have done the thing from which the injury resulted had not such misrepresentation been made; and (5) that he actually suffered damage directly resulting from such fraudulent misrepresentation.

Martens Chevrolet, 292 Md. at 333, 439 A.2d at 537. However, when establishing fraud in the context of an insurance contract, application of the last two elements would lead to an absurd result. The United States District Court for the District of Maryland, quoting the Fifth Circuit, provided an explanation of this absurdity:

> "[i]f, by its own investigation, inspired perhaps by suspicions of the assured's efforts to misrepresent, the insurer satisfied itself that a fraud had been attempted and declined to pay, such a rule would mean that the assured's claim would then stand as though no dishonest acts whatsoever had been practiced. The mendacious assured, surveying the possibilities and contemplating prospective tactics and strategy in the handling of his claim, would sense immediately that vis-a vis himself and the underwriter, there would be no risk at all in his deceit. If it worked, he would have his money and, at worst, could be compelled to disgorge only by affirmative suit by the insurer if the fraud were discovered in time to be legally or practicably effective. If it didn't work-- if, before consummation, fraud was detected-- he would suffer no disadvantage whatsoever. It would be an everything-to-win, nothing-to-lose proposition."

Tru-Fit Clothes, Inc. v. Underwriters at Lloyd's London, 151 F. Supp. 136, 140 (D. Md. 1957)(quoting Cachou v. American Central Ins. Co., 241 F.2d 889, 892-893 (5th Cir. 1957)). To prevent such a result, the requirement to prove detrimental reliance is dropped

for insurers who seek to establish that an insured has submitted a fraudulent claim.  Id.

Although proof of the insured's detrimental reliance is unnecessary, proof of the insurer's intent to deceive remains a vital element in all claims of fraud.  First Union Nat. Bank v. Steele Software Systems, Corp.,  154 Md. App. 97, 147, 838 A.2d 404, 433 (Md. 2003).

MBIC has not provided, nor have we found, any support for its assertion that the absence of the detrimental reliance element in insurance fraud cases, without more, is an indication that the burden of proof should be lessened from clear and convincing evidence to preponderance of the evidence. Precisely because the insurance policy lacks a definition of "fraudulent conduct," the trial court properly looked to Maryland common law fraud to provide instructions to the jury on MBIC's affirmative defense of fraud.

We conclude that clear and convincing evidence is the appropriate burden of proof for an affirmative defense of fraud, whether it is asserted as a common law defense or a contractual defense.

### 2.  Other Circumstances

We next turn to MBIC's contention that the trial court ignored the other two circumstances listed in the policy when it instructed the jury only on the clear and convincing burden of proof.

14

MBIC makes much of the fact that the insurance contract lists separately from "fraud" "intentional concealment or misrepresentation" and "false statements." Again, the policy does not define these terms, and a close look at Maryland case law reveals that the differences, if any, are inconsequential.

In Maryland, the terms "fraud" (otherwise known as "deceit") and "intentional misrepresentation"[4] are often used interchangeably, and the elements necessary to establish intentional misrepresentation are identical to those required for fraud. See B.N.A. v. K.K., 312 Md. 135, 149, 538 A.2d 1175, 1182 (1988) (stating "the elements of the cause of action in what is variously known as fraud, deceit, or intentional misrepresentation are" and listing the required elements); see also McGraw v. Loyola Ford, Inc., 124 Md. App. 560, 584-85, 723 A.2d 502, 514-15 (1999) (using "intentional misrepresentation" and "fraud" interchangeably and listing the required elements); DeLeon Enterprises, Inc. v. Zaino, 92 Md. App. 399, 416-17, 608 A.2d 828, 837-38 (1992) (using "intentional misrepresentation" and "deceit" interchangeably and listing the required elements).

The requirements for intentional concealment are essentially the same as well:

---

[4]Because "concealment" and "misrepresentation" are listed together in the policy provision, we can assume that "intentional" modifies both.

15

> (1) the defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment.

Green v. H & R Block, Inc., 355 Md. 488, 525, 735 A.2d 1039, 1059 (1999). The Maryland Court of Special Appeals has characterized intentional concealment as "actionable fraud." Finch v. Hughes Aircraft Co., 57 Md. App. 190, 231, 469 A.2d 867, 888 (1984) (citing Fegeas v. Sherrill, 218 Md. 472, 147 A.2d 223 (1958)).

The phrase "false statements" does not inherently indicate an intention to deceive. See Medical Mut. Liability Ins. Soc. of Maryland v. B. Dixon Evander & Associates, Inc., 92 Md. App. 551, 570, 609 A.2d 353, 362 (1992) ("A false statement 'is one that is not substantially correct.'") (quoting Batson v. Shiflett, 325 Md. 684, 726, 602 A.2d 1191, 1212 (1992)). However, to void an insurance policy based upon an insured's "false swearing"[5] the statement must have been knowingly and intentionally stated with knowledge of its untruthfulness or with reckless disregard for its truthfulness and with the purpose to defraud. United States Fire Ins. Co. v. Merrick, 171 Md. 476, ___, 190 A. 335, 342 (1937). Because the law does not favor forfeitures, Hartford Fire Ins. Co.

_____

[5]"False swearing" is somewhat different from "false statement" in that it implies a false statement made under oath. Regardless, whether the statement was made under oath is inapposite; both phrases specify an untrue utterance.

v. <u>Himelfarb</u>, 355 Md. 671, 681, 736 A.2d 295, 301 (1999), such a definition is necessary so that an insurer cannot avoid a claim simply because an insured unintentionally provided incorrect information. Moreover, it mimics the definition of fraud and intentional misrepresentation.

The important similarity among these various terms--"fraud," "intentional concealment," "intentional misrepresentation," and "false statements,"--is the scienter requirement, and scienter must be proven by clear and convincing evidence. <u>First Union</u>, 154 Md. App. at 147, 838 A.2d at 433 (Md. 2003) (citing <u>VF Corp. v. Wrexham Aviation Corp.</u>, 850, Md. 693, 704, 715 A.2d 188, 193 (1998)).

MBIC cites to case law in numerous states that require only a preponderance of the evidence burden for an insurer's contractual claim of misrepresentation, false statement, or concealment. <u>See, e.g.</u>, <u>Rego v. Connecticut Ins. Placement Facility</u>, 593 A.2d 491, 494 (Conn. 1991) (applying preponderance of the evidence standard); <u>Horrell V. Utah Farm Bureau Ins. Co.</u>, 909 P.2d 1279, 1281 & n.4 (Utah App. 1996) (same); <u>Williams v. United Fire and Casualty Co.</u>, 594 So.2d 455, 458 (La. App. 1991) (same).

Nonetheless, as long as Maryland remains in the minority of states that require clear and convincing evidence in a common law fraud claim, or until the courts of Maryland decide otherwise, we decline to adopt a preponderance of the evidence standard for an insurer's contractual defenses of fraud, intentional concealment or

misrepresentation, or false statements.  Accordingly, we hold that the district court did not err in charging the jury to apply the clear and convincing burden to MBIC's affirmative defense.

## III. CONCLUSION

Pursuant to the foregoing discussion and analysis, we affirm the district court's exclusion of evidence and charge to the jury.

AFFIRMED